**STATE**

v.

**Donald J. ROBBIO.**

No. 86–58–C.A.

Supreme Court of Rhode Island.

June 4, 1987.

James E. O'Neil, Atty. Gen., Thomas Dickinson, Asst. Atty. Gen., Providence, for State.

Thomas F. Connors, Connors & Kilgus, Providence, for Robbio.

## OPINION

KELLEHER, Justice.

In an indictment filed on June 29, 1984, a Providence County Grand Jury charged the defendant, Donald J. Robbio (Robbio), with the unlawful killing of his daughter, Andrea, a violation of G.L. 1956 (1981 Reenactment) § 11–23–3. Five months later a Superior Court jury, after a three-day trial, found Robbio guilty of involuntary manslaughter. In this appeal Robbio raises three issues.

On April 2, 1984, Robbio, his wife, their three-year-old daughter, Andrea, and one-

year-old son, Jason, lived in Providence in a duplex apartment. The length of the apartment was substantially greater than its width. Two bedrooms were to be found on the second floor of the apartment. From front to rear the apartment's first floor consisted of a living room, a hallway, and a kitchen. In the hallway could be found a bathroom and a closet. During the morning of April 2, Robbio's wife was preparing a shopping list while Andrea danced around the living room to music from the television set. Robbio was seated on a couch in the living-room area. At approximately 11:15 a.m. the wife left the living room, went to the hallway closet where she obtained Andrea's jacket, and put it on the youngster. Mother and daughter were about to embark on a shopping expedition. As the mother returned to the closet to obtain her own coat, she heard a loud gunshot. She immediately turned toward the living-room area and observed Robbio standing approximately two feet from Andrea, who was lying on the living-room floor near the stairway that led to the bedroom area. Robbio then exclaimed, "Oh my God, I shot Andrea." Andrea died later that day of a bullet wound to her head.

Providence police arrived at the Robbio home soon after the shooting. On the floor they discovered a .44–caliber stainless-steel magnum pistol that contained five live "rounds," and a spent "projectile" was found on the living-room floor. The police also observed in the living room a gun rack containing one rifle and two powder handguns, and on the back of the living-room couch was a fully loaded rifle. The rifle's clip contained thirty-nine live rounds and another live round was found in the weapon's chamber. Tests conducted by the police on the .44–caliber magnum revealed that the weapon was in good working order.

In an oral statement given to the police on the day of the shooting, Robbio said that at the time his wife and daughter were getting ready to embark on their shopping expedition, he was in the hallway between the living room and the kitchen. He also explained that he would frequently stand in this location and "dry-fire" his weapon [1] at the back door in the kitchen, using the doorknob as the bull's-eye. He also disclosed that on other occasions he would practice inserting live shells into the weapon, extend his arm, sight on the target, and then remove the shells so that he could rest his arm. He said that he vaguely remembered loading the revolver and that as he turned around, the gun was pointed at the floor. When the gun went off, he tried to go to Andrea's assistance but he "sensed that she was dead." When asked if he was certain that he was standing in the hallway at the time that the magnum was discharged, he replied that he was positive. When asked whether, in practicing his dry-firing technique, he was dry-firing the weapon from the couch before he went into the hallway, Robbio responded, "I've done it so many times, I could have been." The evidence also indicated that there were other occasions when he would fire his weapon into a pile of newspapers that were located in the living room.

Initially, Robbio claims that the trial justice erred when he failed to impose sanctions upon the state for allegedly failing to comply with a certain discovery request. Second, he alleges that his counsel was improperly prohibited from cross-examining his wife concerning her bias or motive in testifying for the prosecution. Finally, Robbio maintains that the trial justice erred in denying his motion for a new trial. We address our attention first to the issue of whether the state complied with Robbio's requests for discovery.

Rule 16 of the Superior Court Rules of Criminal Procedure requires each party to a criminal action to provide the other with specific information upon the other's request. The rule attempts to ensure that both parties receive the fullest possible presentation of facts prior to trial, the primary purpose of the rule being the elimination of unfair surprise. *See State v. Concannon,*

---

1. Robbio explained that while "dry-firing" he would first make certain that there was no one between him and the target, then he would "squeeze off the trigger on an empty cylinder."

457 A.2d 1350, 1353 (R.I. 1983); *State v. Coelho*, 454 A.2d 241, 245 (R.I. 1982). The scope of Rule 16 "makes it one of the most liberal criminal discovery mechanisms in the United States." *State v. Wyche*, 518 A.2d 907, 910 (R.I. 1986).

■ The imposition of any Rule 16 sanction is a matter within the sound discretion of the trial justice. *Concannon*, 457 A.2d at 1353; *Coelho*, 454 A.2d at 245. Here the trial justice concluded that the state's original response to Robbio's request for discovery complied with Rule 16. Our task is to review the record to determine whether the trial justice abused his discretion.

On July 31, 1984 Robbio filed a motion for discovery and inspection. In pertinent portion, the motion read as follows: "[Defendant requests] as to those persons whom the State expects to call as witnesses at the trial, all relevant recorded testimony before a gand [sic] jury of such persons and all written or recorded verbatim statements, signed or unsigned, of such persons and, if no such testimony or statement of a witness is in the possession of the State, a summary of the testimony such person is expected to give at trial." On October 3, 1984, the state filed a response to Robbio's motion, and in reply to the specific request quoted above, the state told the defense that if it wished the grand jury tapes, it should contact a specified member of the Attorney General's staff. Attached to the state's response were a variety of statements and reports.

One of the statements attached, dated April 9, 1984, had been given by Joseph M. Scichilone, assistant armorer for the Providence police department. It read as follows:

"Test fired (1) Ruger Redhawk, .44 Mag. cal., stainless steel, revolver, with a 7 1/2 inch barrel, and with Ser. # 500–97195, and found this weapon to be in good operating order."

On October 3, 1984, the first day of trial, the state filed a supplemental response in which it indicated that Officer Scichilone might be qualified as an expert and that if so, he could give an opinion that "the weapon seized near the body of Andrea Robbio could not have been discharged accidentally."

■ At trial the state called Officer Scichilone to elicit, in part, expert testimony regarding the .44 magnum found in Robbio's home. The defense lodged an objection to the proposed testimony, claiming noncompliance with Rule 16, arguing that there was nothing in the state's first response that would have put the defense on notice that Officer Scichilone would testify as an expert that the weapon in question was incapable of being fired accidentally. A simple, direct, and dispositive response to this claim is to be found in the record. The trial justice, at some juncture, ruled that Officer Scichilone was not qualified as an expert to testify in regard to whether the .44 magnum could have been discharged accidentally. Thus, the issue never came before the jury.

Robbio next contends that the trial justice improperly prohibited him from cross-examining his wife, a prosecution witness, for bias, prejudice, and motive by the use of a prior inconsistent statement. On direct examination his wife testified that the first thing she heard after she heard the gunshot was defendant saying "Oh my God, I shot Andrea." On cross-examination, Robbio's counsel pursued the following line of questioning:

"Q. When the accident happened, you stated that your husband testified 'Oh my God, I shot Andrea,' isn't that correct?

"A. Yes.

"Q. Now did you give a statement to the police department on the same day of the accident?

"A. Yes.

"Q. And it was approximately an hour, hour and a half later. Was it around 1:00 or 2:00 o'clock in the afternoon?

"A. I don't remember what time.

"Q. Do you recall if it was early in the afternoon of the same day?

"A. I guess so. I don't remember.

"Q. Okay. And do you recall if at the same time he said 'Oh my God, I've shot Andrea,' that he also said 'Oh my

God, I shot Andrea. It was an accident'?

"[State]: Objection.

"The Court: Sustained."

After the objection was sustained, defense counsel abandoned this line of questioning and then continued on with the rest of his cross examination. However, before us he faults the trial justice, contending that counsel's efforts during cross-examination to prove the wife's bias as a prosecution witness were stymied by the trial justice. It would appear that if that was what the defense was attempting to establish, the effort fell far short of sustaining the burden in this regard.

■■■ A witness's testimony may be impeached by the admission of his or her prior statements that are inconsistent with the witness's in-court testimony—when a proper foundation has been made for the admission of the impeaching evidence. *State v. Cianci*, 430 A.2d 756, 762 (R.I. 1981). It was emphasized that proper foundation is established when "[t]he witness's attention [is] * * * directed to the nature of the supposed statements and the circumstances under which they were made." *Cianci*, 430 A.2d at 762. The trial justice must also determine whether the statement is in fact inconsistent with the witness's testimony and whether the inconsistency is in any way material to the issues involved in the case. *Id.* Whether the proper foundation has been laid is a question directed to the sound discretion of the trial justice. Id.

■■■ The record is clear that at no time was Robbio's counsel denied the opportunity to cross-examine. Robbio's counsel never indicated to the trial justice the purpose of the two questions relative to a purported statement of Mrs. Robbio quoting her husband as having said that the shot was "an accident," nor did he establish any foundation which would have justified the introduction of evidence of prior-inconsistent statements by Mrs. Robbio containing such a reference.

■■■ We turn now to the denial of Robbio's motion for a new trial. A trial justice, when confronted with a motion for a new trial, considers all the evidence, weighs the credibility of the witnesses, and considers the evidence in the light of the charge given the jury. *State v. Romano*, 456 A.2d 746 (R.I. 1983). If the trial justice believes that the evidence supports a conclusion of guilt beyond a reasonable doubt, the new-trial motion will be denied. *State v. Pittman*, 516 A.2d 882 (R.I. 1986). If a trial justice has sufficiently articulated the rationale for whatever decision is rendered, this court will not disturb such a decision unless the trial justice has misconceived or overlooked material evidence or was otherwise clearly wrong. *State v. Tarvis*, 465 A.2d 164 (R.I. 1983)

■■■ Involuntary manslaughter, we have said, is an unintentional homicide without malice aforethought, committed either in the performance of an unlawful act not amounting to a felony or in the performance of a lawful act with criminal negligence. *State v. Lillibridge*, 454 A.2d 237 (R.I. 1982). Here the trial justice, in seeking to define criminal negligence in his charge to the jury, employed language found in *State v. Ruggiero*, 93 R.I. 241, 250, 174 A.2d 555, 559 (1961), where the court was replying to the defendant's claim that the trial justice had erred when he defined "criminal negligence." In *Ruggiero* the trial justice, after noting that the prosecution was required to prove something more than "simple negligence," spoke of conduct that indicated an "indifference to consequences." The court in *Ruggiero*, in upholding the trial justice's language, referred to a discussion of criminal negligence found in 26 Am. Jur. *Homicide* § 210, and observed that it was obvious that the trial justice was "referring to conduct which was such a departure from what would be that of an ordinarily prudent or careful man in the same circumstances as to be incompatible with a proper regard for human life, or an indifference to consequences." 93 R.I. at 250, 174 A.2d at 559. Here the trial justice, like his predecessor in the *Ruggiero* case, relied upon certain language found in § 210, and he pointed out to the jury that when a charge

is criminal negligence, proof of a greater degree of fault is required than is needed in a civil-negligence action. He defined criminal negligence as "conduct which is such a departure from what would be that of an ordinarily prudent or careful man in the same circumstances as to be incompatible with a proper regard for human life, or an indifference to consequences." The trial justice then went on to observe, "Put in another way, a person is criminally negligent if, under a given set of circumstances, he fails to conduct himself as an ordinarily prudent or careful man would conduct himself under those same circumstances, and his conduct is incompatible with a proper regard for human life, or an indifference to consequences." [2] There was no objection to that charge.

A review of the record reveals that the trial justice conducted a detailed analysis of the evidence adduced at trial. He passed upon the credibility of the key witness, Robbio's wife, describing her as a "very truthful witness." As a consequence, the trial justice recalled and chose to believe Mrs. Robbio's statement that just after she heard a shot, she saw Robbio jumping up and down, stating, "Oh my God, I shot Andrea." The trial justice rejected Robbio's oral statement to police that he was putting the gun away when it discharged. After considering all the evidence, the trial justice concluded that Robbio was actually "dry-firing" a loaded handgun when the weapon went off. The trial justice also found that Robbio's statement to police detectives, read as a whole, indicated that he was dry-firing his handgun on the day of the incident and additionally that he was, as his wife had testified, on the couch when the weapon was fired.

In reviewing the evidence, the trial justice gave specific reasons for the conclusions he reached. See State v. Young, 447 A.2d 390, 392 (R.I. 1982); State v. Gelinas, 417 A.2d 1381, 1388 (R.I. 1980). Thus it is our belief that the trial justice's denial of Robbio's new-trial motion was amply warranted by the evidence and will not be disturbed by this court.

We would note that the issue in this case was put in its true focus by Lieutenant Michael J. Dutra of the Providence fire department's emergency medical division, who, after his arrival at the Robbios' apartment to render first aid, saw Robbio's arsenal and also determined that first aid was not the answer. Upon leaving the duplex, the lieutenant saw a "very, very nervous" Robbio pacing up and down the sidewalk with medication for his nerves in hand. The officer relieved Robbio of his medicine and he then asked him what he was doing with a loaded gun in a house with children. The jury's verdict was an appropriate response to this inquiry.

The defendant's appeal is denied and dismissed, and the judgment of conviction appealed from is affirmed.

---

2. In speaking of criminal negligence, 40 Am. Jur. 2d *Homicide* § 210 (1968), in its pertinent portion, states: "The negligence must be wanton, aggravated, culpable, gross, reckless, or criminal; that is, the conduct of the accused must be such a departure from what would be the conduct of an ordinarily prudent or careful man under the same circumstances as to be incompatible with a proper regard for human life, or, in other words, a disregard for human life or an indifference to consequences." It should also be noted that in *State v. McVay,* 47

R.I. 292, 295–96, 132 A. 436, 438 (1926), the court equated "criminal negligence" with "gross negligence." Trial justices, in dealing with a criminal negligence charge, should avoid the use of such terms as "wanton recklessness" and "willful disregard" of the harmful consequences because such a state of mind goes beyond negligence. Such a state of mind can supply the element of malice necessary to raise a homicide to the level of common-law murder. *See State v. Iovino,* 524 A.2d 556 (R.I., 1987); R. Perkins & Boyce, *Criminal Law,* at 842, 848 (3d ed. 1982).