STATE

v.

**Maryanne CACCHIOTTI.**

No. 88–521–C.A.

Supreme Court of Rhode Island.

Jan. 26, 1990.

James E. O'Neil, Atty. Gen., Jeffrey J. Greer, Asst. Atty. Gen., Annie Goldberg, Sp. Asst. Atty. Gen., for plaintiff.

George M. Muksian, Providence, for defendant.

## OPINION

WEISBERGER, Justice.

This case comes before us on the defendant's appeal from a judgment of conviction of involuntary manslaughter entered in the Superior Court for the County of Kent. We affirm. The facts of the case insofar as they are pertinent to this appeal are as follows.

On September 11, 1985, the defendant, Maryanne Cacchiotti, brought her three-year-old son Mark to a fire station in West Warwick at about 1:11 a.m. Wayne Willette was on duty at the station. He admitted defendant and attempted to render assistance. Willette noted that there were bruises on the head, face, arms, legs, and feet of the child. When Willette asked defendant what had happened, she responded that she had lost control the night before and struck the child on the back and stomach. Willette attempted cardiopulmonary resuscitation, and a volunteer summoned a rescue vehicle. The boy was rushed to Kent County Hospital where he was pronounced dead at 1:31 a.m.

The defendant remained at the fire station and volunteered a statement to Patrolman Peter Brousseau that she had beaten the child the day before but had not realized how bad the injuries were. The defendant was taken back to her home where her five-year-old daughter was still sleeping. There she was given *Miranda* warnings, but she signed a written waiver and consented to a search of the house. She then answered further questions and stated that she had beaten Mark at about 5:00 p.m. on Monday, September 9, with her hands and a paddle. After she had given these statements, defendant was informed later in the morning that her child had died. She was further informed that she was under arrest for murder. At that point she recanted her earlier statements and assert-

ed that the fatal beating had been administered by her live-in boyfriend, Phillip Flanigan.

Subsequent to her recantation, the police took two further written statements from defendant, one handwritten and one typewritten. The defendant explained in these statements that she had struck her son with her hands and a paddle on September 9, but did not leave any bruise marks on him. She further stated that she did not like Mark, Jr., her son, but would not hurt him. She went on to state that Flanigan had been hitting the boy for the past two weeks, but had told her that if she sought help, "she would have a problem because of all the black and blue marks, and they would take the children away from her." The written statements were first admitted as exhibits but later stricken from the record. However, the testimony of the officers and the testimony of defendant in respect to matters contained in the statements were allowed to be considered by the jury under a ruling made by the trial justice.

At the trial of the case defendant testified in her own defense and stated generally that Flanigan moved in with her and her children sometime in March 1985. He contributed nothing to her support or that of her children and frequently took money from her welfare allotment to wager at the racetrack. He was not employed and would usually spend his days at home studying racing literature and his evenings at the track.

After Flanigan had been living in the house for a few weeks, according to defendant, he began verbally and physically to abuse Mark because the child frequently wet a bed that Flanigan had brought into the house so that he could sleep with defendant in her large bed. He beat the child "pretty hard," according to defendant, and at times would kick him and throw him against walls. In addition to beating the child with a wooden paddle, defendant stated that "he would really physically hurt Mark. He would punch him a lot." Nevertheless defendant stated that she still loved Flanigan.

Other witnesses testified that in the course of punishing the child for his incontinence, Flanigan burned Mark's finger on a light bulb and another time burned his finger on a bathroom pipe. Flanigan also made the child kneel or stand in the corner with arms outstretched and a vegetable can in each hand for an hour or so. Flanigan's abuse toward the child became sufficiently unbearable so that defendant, along with her next-door neighbor Marjorie Bailey, took her children to a place where she expected to find, and did find, an automobile owned or controlled by her estranged husband (Mark's father). The automobile was parked on a street in Olneyville and was unoccupied. She placed both her children in the automobile without notifying her husband that she had done so or the reason for her having done so. She did tell Marjorie Bailey that she was afraid she might kill one of the children some day. The father, who had been separated from defendant since about December of 1984, lived part of the year in Florida. The defendant later learned that the father took the children to Florida where they stayed with him and their paternal grandmother until midsummer. At that time the father, who was totally unaware of Flanigan's abusiveness toward his son, returned the children to defendant.

The abuse by Flanigan continued, according to defendant's own testimony. The beatings for the bed-wetting continued to be a regular event. On or about Labor Day of 1985 (approximately one week before the child's death) defendant called her father-in-law, Frank Cacchiotti, and asked him to take Mark from her home. She further stated to her father-in-law that the child wet the bed and "does things wrong, and if you don't take him, I will kill him." She stated in her testimony that she did not really mean that she was going to kill the child but that she wanted to impress upon her father-in-law the need to take her son. However, she did not tell her father-in-law about Flanigan's abusive treatment or beatings. The father-in-law said that he would take the child but could not do so right away because he wanted to make arrangements with the Family Court. The

grandfather testified that he had no idea of the true situation—otherwise he would have taken the child immediately.

On September 9 at about five o'clock in the afternoon Mark was playing with rabbits outside the home. Flanigan summoned him, and Mark responded "[N]o, I am playing with the rabbits." Flanigan then emerged from the house, punched the child with his fist, and tried to kick him. The child ran screaming into the house with Flanigan following him. The defendant was in the house in the kitchen at the time. She stated that Flanigan beat the child in the bedroom with the paddle, and when she attempted to interfere, she was slapped in the face. She took the child into the bathroom and cleaned him. That night Flanigan went out and returned at about 11:00 or 11:30 p.m. As was his custom, he went upstairs to check if Mark had wet the bed. He roughly brought the child downstairs and put him into the bedroom that he shared with defendant. He began to strike the child with the paddle. The defendant stated that she tried to interfere but was punched in the stomach herself. Then Flanigan began to punch Mark repeatedly with a closed fist. He then walked out of the bedroom, leaving the child on the floor crying, "[d]on't hit me, don't hit me." The child ultimately went to sleep on the couch. The defendant went back to her bedroom with Flanigan.

The next morning Mark told his mother that he did not feel well. She took him into the bathroom where he vomited. She noted that he was all black and blue from the beating he had received the night before. The defendant stated that she was so upset that she went and woke Flanigan and told him to look at what he had done to Mark. She stated that she thought "he should go and get help and take him to the hospital." Flanigan responded that if she told anyone about this, "they would take my kids away from me * * * I was afraid to do anything." She gave the child his breakfast, and afterward he became sick again. She held him while he vomited. She again told Flanigan that the child did not look well and that she wanted to help him. Flanigan refused to be of assistance. She contin-

ually acknowledged that although she thought the child needed medical attention, she was fearful that she would get into trouble if she sought help.

Later that morning when the grandfather came to pick up some jewelry, Flanigan told defendant not to tell him about the beating, and she complied. She stated, "I did everything I could to hide the beatings that Mark was getting from Phil." The grandfather picked up the jewelry and left without being aware of Mark's condition because defendant had told him that the child was in school.

That evening defendant fed the two children and got them ready for bed. According to her testimony, Mark said that his stomach bothered him, and he was still black and blue. The children went to bed between 7:00 and 8:00 p.m. Flanigan, who had gone out for the evening, came back about 11:00 p.m. during the news broadcast, and again went up to the bedroom. It is not clear what he did at that time, but according to defendant, he brought the child downstairs and the child began to vomit. The child said, "[m]ommy, I think I am going to die." Flanigan refused to help her, but when she noted that the child seemed to be lapsing into unconsciousness, she took him to the fire station. She did not account for occurrences that took place between Flanigan's return and her arrival at the fire station at approximately 1:11 a.m.

The medical examiner testified that the fatal injuries were sustained sometime within a period ranging from twelve hours to forty-eight hours prior to the pronouncement of death. He testified to bruises and abrasions over portions of the child's body. He found significant injuries to the abdomen, which included a ruptured or torn blood vessel that had emitted a large quantity of blood that lay free in the abdomen. In his opinion the cause of death was the free blood in the abdominal cavity owing to lacerations of the mesentery and intestine. He was further of the opinion that these injuries were caused by blows of sufficient force to injure the vital structures under the area of impact. He testified that some

of the injuries had been imposed upon the child within a period less than four hours prior to death. This timetable raised a question of fact concerning whether Flanigan may have struck the child before bringing him downstairs somewhat after 11:00 p.m. on September 10. The medical examiner expressed the opinion that had medical attention been given at or shortly after 6:00 p.m. on September 10, when the child ate his dinner, his life would have been saved. In fact, the doctor suggested that during the period from approximately 7:00 a.m. on September 10, when the child came downstairs, to shortly after 6:00 p.m. when he had dinner consisting of macaroni, cheese, and milk, medical attention would have been effective in saving the child's life.

The defendant was charged with first-degree murder as a result of the child's death. The trial justice denied her motion for judgment of acquittal and submitted the case to the jury on four possible theories. He stated to the jury that it could return a verdict of either first or second-degree murder, voluntary manslaughter, or involuntary manslaughter. The jury returned a verdict of guilty of involuntary manslaughter. After denying defendant's motion for a new trial, the court sentenced her to thirty years of imprisonment, of which ten were suspended, with a requirement that defendant be subject to a ten-year period of probation subsequent to her release.

In support of her appeal defendant raises two issues that were argued together, but considered separately herein.

## I

### THE MOTION FOR JUDGMENT OF ACQUITTAL

■ It is clear beyond doubt that the evidence in this case, when viewed in the light most favorable to the state—and when all reasonable inferences are drawn in favor of the prosecution, would have justified a jury in finding that the state had proven the offense of first-degree murder or any lesser included offense beyond a reasonable doubt. *See State v. Wheeler,*

496 A.2d 1382 (R.I.1985); *State v. Lillibridge,* 454 A.2d 237 (R.I.1982); *State v. Giordano,* 440 A.2d 742 (R.I.1982). Extensive analysis of this issue is not required. Suffice it to say that defendant's voluntary admissions to the firefighter, her spontaneous admission to Patrolman Brousseau, and her later admissions to other members of the West Warwick police department would have, when viewed under the standard applicable to a motion for judgment of acquittal, warranted a jury's finding beyond a reasonable doubt that this defendant had brutally beaten her child, deliberately withheld medical treatment from him in such a manner as to constitute the unlawful killing of the child with malice aforethought, and further that she formed her intent to kill for more than the momentary period of time suggested in *State v. Fenik,* 45 R.I. 309, 121 A. 218 (1923).

Although defendant later recanted her confession, the trial justice was precluded from considering the issue of credibility and would have been required to view the evidence in the light most favorable to the state. Thus he would have of necessity considered her incriminating statements and confessions at their face value.

Consequently the trial justice was correct in denying defendant's motion for judgment of acquittal.

## II

### THE MOTION FOR NEW TRIAL

■ The defendant argues that on motion for new trial the trial justice, after weighing the credibility of the witnesses and exercising his independent judgment concerning the weight of the evidence, should have found insufficient evidence to support the jury's verdict of guilty of involuntary manslaughter. We must disagree. We are of the opinion that defendant's own testimony, when viewed in the context of other highly credible testimony, ·convicts her of involuntary manslaughter beyond a reasonable doubt.

The trial justice, in denying the motion for new trial, relied upon the failure of

defendant to seek medical attention during the last day of the child's life, even though she herself repeatedly admitted at trial that the child needed immediate hospitalization. This court has long held that the crime of involuntary manslaughter may be based upon proof that a defendant has been guilty of gross negligence and that such gross negligence is equated with the term "criminal negligence." *State v. McVay*, 47 R.I. 292, 294–96, 132 A. 436, 438 (1926). This court has more recently affirmed this standard in *State v. Robbio*, 526 A.2d 509 (R.I.1987), wherein we pointed out that the gross negligence standard was properly applicable, and that trial justices should avoid the use of such terms as "wanton recklessness" and "willful disregard" of the harmful consequences since that state of mind would supply the element of malice necessary to raise a homicide to the level of common law murder. *Id.* at 514 n. 2; *State v. Iovino*, 524 A.2d 556 (R.I.1987); R. Perkins & Boyce, *Criminal Law*, at 842, 848 (3d. ed.1982).

The defendant's own testimony is replete with statements that she believed that her son required hospitalization and she repeatedly requested that Flanigan take the child to the hospital. Nevertheless she neglected to seek medical attention for the child over a period from 6:00 p.m. on September 9 until approximately 1:00 a.m. on September 11. Although she admitted that she saw that the child had been badly bruised and was vomiting she refrained from seeking medical assistance, not because she feared Flanigan, but because she thought she might get into trouble over the beatings. This would scarcely constitute a valid excuse for not carrying out her duty to protect her child. The state and defendant cite numerous cases that assert the proposition that a parent has a legal obligation to protect a child and may be criminally culpable for the failure to act affirmatively to seek assistance or attempt to prevent injuries which result in the child's death. *See, e.g., Palmer v. State*, 223 Md. 341, 164 A.2d 467 (1960); *Commonwealth v. Howard*, 265 Pa.Super. 535, 402 A.2d 674 (1979); *State v. Williquette*, 129 Wis.2d 239, 385 N.W.2d 145 (1986). Indeed, it has

been held that a mother was guilty of murder for failure to protect her child from abuse over an extended period by a male companion and failure to provide medical care or protection. *Lott v. State*, 686 S.W.2d 304 (Tex.Ct.App.1985).

The defendant accepts the standard and recognizes the duty to protect her child, but suggests that her conduct was not nearly as culpable as the conduct set forth in the cited cases. It is not necessary to compare the ghastly facts of each of these cases with the horrendous facts of the case at bar. It is obvious that on the last night of this helpless child's life defendant had many opportunities to take him for medical care. As the trial justice pointed out, the medical examiner testified that had the child been given medical attention before 6:00 p.m. on September 10, the child would have survived. The defendant could not have been fearful of Flanigan between 6:00 p.m. and 11:00 p.m. since he was out of the house during that period. It was only her own desire to avoid getting into trouble over the bruises and to cover up Flanigan's conduct that inhibited her from seeking the necessary medical attention. In relying upon these facts as a basis for denying the motion for new trial, the trial justice committed no error. He did not overlook or misconceive relevant evidence and certainly was not otherwise clearly wrong. *State v. Tooher*, 542 A.2d 1084 (R.I.1988); *State v. Caruolo*, 524 A.2d 575 (R.I.1987); *State v. Lerner*, 112 R.I. 62, 308 A.2d 324 (1973).

Had he chosen to do so, the trial justice could have sustained the jury's verdict on additional grounds. By her own testimony the defendant saw brutal abuse of her three-year-old son by Flanigan over a significant period of time. This abuse caused her to send her children away with their father earlier in the year. She repeatedly stated in her own testimony that she was fearful that Flanigan would commit serious harm to little Mark. She had seen numerous examples of his ferocity in dealing with the child's bed wetting and incontinence. None of these observations, however, caused her to remove the child from this peril that she clearly foresaw. She failed

to describe the danger to her father-in-law even on the day when the final series of beatings commenced (September 9). She had numerous opportunities to remove the child from this danger, but was deterred by not wanting to get into trouble and not wanting to reveal Flanigan's conduct. The jury could well have found and the trial justice could well have concurred in the finding that her lust for Flanigan completely overcame her sense of duty to her child. If any case discloses a set of facts that establish gross or criminal negligence in the failure to perform a mother's duty to protect her child, the case at bar establishes beyond a reasonable doubt such a fact pattern. Consequently the defendant's appeal from the denial of her motion for new trial is without merit.

For the reasons stated, the defendant's appeal is denied and dismissed. The judgment of conviction of involuntary manslaughter is affirmed. The papers in the case may be remanded to the Superior Court.