**STATE**

v.

**David McLAUGHLIN.**

No. 91–280–C.A..

Supreme Court of Rhode Island.

Feb. 10, 1993.

James E. O'Neil, Atty. Gen., Aaron Weisman, Jeffrey Greer, Asst. Attys. Gen., for plaintiff.

Richard Casparian, Public Defender, Barbara Hurst, Catherine Gibran, Asst. Public Defenders, for defendant.

## OPINION

SHEA, Justice.

This matter comes before the Supreme Court on the appeal of the defendant, David McLaughlin (McLaughlin) from a conviction in Superior Court on the first and third counts of a three-count indictment. The defendant was convicted of manslaughter, in violation of G.L.1956 (1981 Reenactment) § 11–23–3, as amended by P.L.1985, ch. 421, § 1, and of the entering of a dwelling house with the intent to commit larceny, in violation of § 11–8–3. The trial justice entered a judgment of acquittal on the second count charging the defendant with breaking into and entering Del's Lemonade. For the reasons that follow we vacate and remand for a new trial.

On appeal defendant raises these four issues: that the trial justice erred in submitting the theory of involuntary manslaughter by virtue of criminal negligence to the jury; that the trial justice erred in denying a motion for a judgment of acquittal on the theory of misdemeanor manslaughter; that the trial justice erred in failing to grant a judgment of acquittal on the charge of entering the residence of Dr. Charles Round with the intent to commit larceny; and finally that the trial justice's decision on the voluntariness of McLaughlin's statement, his ruling on admissibility of evidence relevant to voluntariness, and his charge to the jury on how to assess voluntariness all suffered from a lack of understanding of the proper standard for determining coercion and all were error.

The tragic events in this case began on the evening of April 1, 1988.[1] Our knowl-

---

1. In reality, this tragedy began long before that April night. The family situation, as evidenced by the testimony of both Gary Ellinwood and Jesse Ellinwood, most certainly contributed to Juston's fate. Gary Ellinwood had a lengthy criminal record, and Laurie Ellinwood, Juston's mother, was often absent from the home overnight. Gary admitted at trial that they had been

edge of these events come principally from defendant's testimony. Juston Ellinwood (Juston),[2] aged nine and his eight-year-old brother, Jesse, had a few friends over to play Atari and watch television at their home at 15 Harvard Avenue in Warwick. The boys' father, Gary Ellinwood (Ellinwood), was home, but their mother, Laurie Ellinwood, was out for the evening. Sometime between 7 and 8 p.m., McLaughlin came to the Ellinwood home looking for the father. Shortly thereafter, Ellinwood and McLaughlin left the house, leaving the boys alone. Enroute Ellinwood ran into another friend and went for a ride with this other friend leaving defendant behind. Ellinwood returned home alone about an hour and a half later to find his sons and their friends still playing. He remained at home for some time but left to purchase cigarettes later that night, again leaving the boys alone.

While Ellinwood was out getting cigarettes, McLaughlin returned to the Ellinwood home again, looking for him. It was about 11:30 p.m. or midnight by that time. Jesse had fallen asleep on the couch, and the boys' friends had gone home. Juston answered the door and said that he did not know where his father was. The defendant testified that Juston then told him that he was hungry and asked him to go for a ride. According to defendant, Juston told him that he wanted to go and break into some places. Juston and defendant left the house together. The defendant took a bike from the yard, and Juston rode on a scooter.

The first stop they made was Del's Lemonade on Warwick Avenue. Juston entered the building through a window and returned with a collection of candy, gum, baseball cards, and $10's worth of rolled pennies.[3] The pair moved on to the residence of Dr. Charles Round, four blocks up on Warwick Avenue from Del's Lemonade. The defendant knew Dr. Round because he had grown up with his children and had been in the house previously. When defendant was unable to break into the house by kicking a door, Juston broke a cellar window and climbed into the basement. The defendant testified that he waited on the picnic table in the yard while Juston was inside. He then entered the house through the basement window to find Juston. The two remained in the basement until an alarm was activated. The alarm seemed to be set off by an attempt to gain entrance to the main floor of the house from the basement. An old Minerva Tropic Master, described as a radio that Dr. Round had purchased in 1943, was taken from the house. The defendant maintains that although he may have assisted Juston in carrying the radio out the cellar window, it was Juston who took the radio and transported it from the home. In Dr. Round's yard, the two left a trail of packages of gum, Del's Lemonade cups, and garden tools. From Dr. Round's home the two made a brief stop when they came across a Corvette parked in a driveway. Juston broke into the car but could not get it started. The defendant conceded that he got into the car while Juston was trying to start it. When the effort was unsuccessful, they continued on until they reached Buckeye Brook.

The defendant and Juston left the car and approached Buckeye Brook from the Stillwater Drive side. McLaughlin carried the scooter and the candy to the other side of the brook while Juston brought the bike and the radio he had taken from Dr. Round's house. Once across the brook they left the bike, the scooter, and the radio on the other side. They left the

---

questioned a "few" times regarding the supervision of their young sons. He also testified that it was not until 7 or 8 p.m. on April 2, 1988, about twenty hours after Juston had gone out of the house with defendant, that he even became concerned or noticed that his nine-year-old son was missing. Up until that point, it was only Jesse, aged eight, who was concerned about his brother's whereabouts.

2. The boy's name is inconsistently spelled both "Justin" and "Juston" throughout the record. We use the latter spelling as that is how it appears on the death certificate.

3. There was no evidence to support a charge that defendant had broken into Del's Lemonade. As a result, defendant's motion for a judgment of acquittal on a charge of breaking and entering with intent to commit larceny was granted.

Buckeye Brook area and headed up a path to Cedar Swamp Road. Juston then wanted to break into the Sweet family house on Cedar Swamp Road. The defendant knew the Sweets and warned Juston of potential harm by the Sweets if he attempted to break in. At this point the events of the night turned.

The defendant testified that he was cold and wet and wanted to go home while Juston insisted that they break into the Sweet home. The pair argued about the housebreaking, and Juston then headed back toward the brook. The defendant followed Juston toward the brook and testified that they continued arguing. According to defendant, Juston grabbed the scooter from the side of the brook and headed back into the water. When Juston was in the water, where it was about two feet deep, defendant followed him down from the edge of the brook. McLaughlin stated that during their argument about whether to continue to break into houses, Juston began grabbing at and pulling on his right leg. In order to calm Juston down, defendant hit him in the head with the back of his hand.

After defendant hit Juston in the head, he testified that he, Juston, did not react. He did not fall or begin crying. When defendant looked at Juston he appeared to be half walking and half swimming. He did not appear to defendant to be in any danger. The defendant then picked up the radio taken from Dr. Round's house and threw it into the brook. Even after he threw the radio into the water, defendant indicated, Juston still appeared to be fine. The defendant then left the brook area and ran home. The last he saw of the boy was in the water, appearing to be in control. Juston's body was found the next day, April 2, 1988, by two boys playing near the brook.

I

The defendant first challenges his conviction for involuntary manslaughter on the grounds that the trial justice erred in submitting the theory of criminal negligence to the jury.

■ At trial the state presented the two theories of involuntary manslaughter on which a jury could potentially convict defendant. Involuntary manslaughter is defined as an unintentional homicide without malice aforethought, committed either (1) in the performance of an unlawful act not amounting to a felony or (2) in the performance of a lawful act with criminal negligence. *State v. Robbio*, 526 A.2d 509 (R.I. 1987).

The state posited that misdemeanor manslaughter could follow from defendant's admission that he had hit Juston in the head. The state argues that this blow, amounting to an assault, was the cause of Juston's drowning. The state presented evidence of the head injury and testimony linking the injury to Juston's death. In order to convict defendant on this theory, the jury would need to find beyond a reasonable doubt both that defendant had committed an assault and that the assault was the proximate cause of the death. This theory as presented to the jury does not raise a problem.

The second theory that the state relied on is the criminal negligence theory. The state concedes in its brief that under the criminal-negligence theory it must be assumed that Juston did not drown as a result of the blow by defendant. Instead, something other than the blow to Juston's head would have to have proximately caused his death. A conviction under this theory would require evidence that defendant was aware that Juston was in peril and did not come to his aid. It follows that if something other than defendant's blow caused Juston to drown and defendant was not aware that Juston was drowning or in any danger, then he could not have been criminally negligent toward Juston.

■ The state concedes that only if there is some evidence from which the jury could have inferred defendant was aware of Juston's peril and did not act to aid him could defendant be found to have proximately caused Juston's death. *State v. Wheeler*, 496 A.2d 1382 (R.I.1985). However, awareness and a failure to act alone are not

sufficient to support a conviction on this theory. To find criminal liability for failing to act, there must first exist a legal duty to act. In the absence of such a duty, one cannot be held liable, either civilly or criminally, for a failure to act. *Id.* at 1391. A moral duty is not enough.[4]

■■■ The existence of a legal duty is a question of law and not therefore within the province of the jury. Such a duty of care may be imposed by either the common law or by statutory mandate.[5] Under the common law there is no general duty of care imposed on a person to protect, render assistance, or to otherwise be responsible for another's safety and welfare. Exceptions to that general rule do exist, but they are normally based upon a special relationship between the parties.

In their treatise on criminal law, LaFave and Scott identify seven situations in which such a duty may be imposed. Those situations are (1) duty based on relationship, (2) duty based upon statute, (3) duty based upon contract, (4) duty based upon voluntary assumption of care, (5) duty based upon creation of the peril, (6) duty to control conduct of others, and (7) duty of landowner. LaFave & Scott, *Criminal Law*, § 3.3 at 202–07 (2d ed.1986). The second, third, sixth, and seventh categories have no significance in this case. The state relies on the first and fourth type of duties in its argument. However, we do not find sufficient evidence to support the existence of a duty under either of these categories.

The "special relationship" referred to would be that of a parent and child or husband and wife. *Id.* at 203. The duty may extend where an employment situation creates a special relationship by its nature. There are varying possibilities in which a special relationship may arise:

"[A] parent may be guilty of criminal homicide for failure to call a doctor for his sick child, a mother for failure to prevent the fatal beating of her baby by her lover, a husband for failure to aid his imperiled wife, a ship captain for failure to pick up a seaman or passenger fallen overboard, and an employer for failure to aid his endangered employee." *Id.* at 203–04.

■■■ Reaching even further, the state tries to analogize the escapade of Juston and defendant that evening to a joint enterprise. In certain situations a joint enterprise may be a relationship that gives rise to a legal duty. A common example is that of two mountain climbers alone on a mountainside when one climber falls and needs the assistance of the other. *Id.* at 204. A similar example might be found when two people, though not closely related, live together under one roof in mutual reliance. *Id.* However, there is insufficient evidence to equate the activities of Juston and defendant to that of a joint enterprise.

■■■ A duty can also be created by a voluntary assumption of risk. "[I]f one voluntarily and gratuitously assumes responsibility for a helpless person—such as for a child or an insane or infirm person—he has a duty thereafter to protect the other from harm." *Id.* at 205–06. The state contends that McLaughlin voluntarily and gratuitously assumed responsibility for Juston, yet it failed to present any evidence to even suggest that that was the case. Contrary to what the state suggests, there

---

4. Citing *State v. Robbio*, 526 A.2d 509 (R.I.1987), defendant properly noted in his brief that there is always, of course, a duty to refrain from acting recklessly toward another person. When one *acts* recklessly, one is criminally liable regardless of the relationship between the parties. This theory of liability would require a finding that defendant's affirmative act of hitting Juston was reckless and resulted in his death. The state did not rely on this theory of recklessness at trial or in this appeal and would be precluded from raising it now.

5. The state requested an instruction to the jury that G.L.1956 (1981 Reenactment) § 11–56–1, as enacted by P.L.1984, ch. 416, § 1 imposed an affirmative duty to render reasonable assistance, "[e]ven if defendant did not cause any danger to the victim." The trial judge denied the request, and the state did not raise an objection. Section 11–56–1 imposes a very limited duty on the part of citizens at large to render aid to one another when a person "at the scene of an emergency * * * knows that another person is exposed to * * * grave physical harm." There was no evidence presented in this case to invoke this limited statutory obligation.

was no evidence that defendant secluded Juston and prevented him from obtaining any other assistance. An inference based only on the age disparity between the two, the size difference, the time of night, and the purpose of their activities is simply not enough to give rise to this voluntary assumption of care. We distinguish this case from the cases relied on by the state because there was no evidence presented to show that defendant took Juston into his care.

Although the state does not rely on the fifth type of situation, we dismiss the possibility of a duty created because of defendant's causing the peril. As stated previously, the prosecution assumes, by relying on the theory of criminal negligence, that the blow to Juston's head did not cause his death. In order to find that a duty exists under this category, the state would have to present facts that show that defendant caused the peril that led to the drowning. No evidence was presented on this theory either. We therefore find no legal duty.

■ The trial justice instructed the jury that

"[c]riminal negligence means more than just mere or ordinary negligence which is always frequently an element in a civil case. Whether negligence amounts to criminal or ordinary negligence depends on the degree of negligence presented, if any. If the harm has resulted from the failure to use care which a reasonable prudent person would have used under the circumstances, then that harm has resulted from negligence, but it's not criminal negligence unless the conduct was such a gross deviation from the standard of care that a reasonable person would have observed under the same circumstances and in order to find criminal negligence you must find more than simply a mistake in judgment by the defendant. Bear in mind that the defendant does not have a duty to foresee the unforeseeable, but what you must be persuaded of is that the defendant's conduct was a departure from what would have been conduct of an ordinary prudent and careful person under the same

circumstances as to be incompatible with proper regard for human life or in other words, disregard of human life or indifferent to its consequences.

"In order to convict the defendant of involuntary manslaughter, it's not enough that the defendant's action or the defendant's inaction amounted to criminal negligence. Criminal negligence in and by itself is not sufficient to have a finding of guilt. If you find criminal negligence on the part of this defendant either because of his actions or inactions, you must also find that such criminal action was the proximate cause of the victim's death."

An instruction of criminal negligence in the absence of a legal duty is error. An interrogatory to the jury on which it indicated that its verdict was based upon the misdemeanor-manslaughter theory could have remedied the situation. However, we have no indication of how the jury determined defendant's guilt.

The state, in a postargument memorandum, asserts that even if this court finds the criminal-negligence instruction to be error, the conviction should stand because the jury could convict McLaughlin on the legally sufficient theory of misdemeanor manslaughter. Relying on *Griffin v. United States*, —— U.S. ——, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991), the state "urged this court to consider *Griffin* as authority for the proposition that a general verdict on a multiple theory charge should not be set aside if one of the theories turns out to be, as a matter of fact, insufficient to support this charge." We must distinguish this case from *Griffin* because here the criminally-negligent instruction in the absence of an instruction that a duty must exist was error. In view of the fact that the giving of the instruction was error as a matter of law, we must vacate the conviction for involuntary manslaughter and remand for a new trial.

## II

■ The defendant also argues that the trial justice erred in failing to grant a judgment of acquittal on the charge of

misdemeanor manslaughter and the charge of entering Dr. Round's residence with the intent to commit larceny. Rule 29 of the Superior Court Rules of Criminal Procedure provides a means for a defendant to challenge the sufficiency of the evidence by a motion for a judgment of acquittal. *State v. Clark,* 603 A.2d 1094, 1097 (R.I. 1992) (citing *State v. Collazo,* 446 A.2d 1006, 1011 (R.I.1982)). The standard that a trial justice must employ is well settled. "The trial justice must determine whether the evidence presented by the state is capable of supporting proof of guilt beyond a reasonable doubt." *State v. Mattatall,* 603 A.2d 1098, 1105 (R.I.1992) (citing *State v. Caruolo,* 524 A.2d 575, 581 (R.I.1987); *State v. Gordon,* 508 A.2d 1339, 1348 (R.I. 1986); *State v. Wheeler,* 496 A.2d 1382, 1389 (R.I.1985)). The trial justice makes this determination by viewing all the evidence in the light most favorable to the state without weighing the evidence or assessing the credibility of the witnesses. *Mattatall,* 603 A.2d at 1105 (citing *State v. Caruolo,* 524 A.2d at 581). "[C]ircumstantial and direct evidence should be given equal weight." *State v. Wilshire,* 509 A.2d 444, 452 (R.I.1986). "The trial justice must draw all reasonable inferences that are consistent with the guilt of the accused." *State v. Simpson,* 611 A.2d 1390, 1393 (R.I.1992) (citing *State v. Capuano,* 591 A.2d 35, 36 (R.I.1991)). "Unless the evidence so viewed fails to establish defendant's guilt beyond a reasonable doubt, the motion for judgment of acquittal must be denied." *Mattatall,* 603 A.2d at 1105 (citing *State v. Burke,* 522 A.2d 725, 734 (R.I. 1987)).

The trial justice carefully outlined this standard for deciding a motion for judgment of acquittal in his decision when he stated:

> "[T]he trial justice must determine whether evidence presented is capable of generating proof of guilt beyond a reasonable doubt. On review we view the evidence in the light most favorable to the state to draw all reasonable inferences consistent with guilt and may not weigh the evidence nor assess the credibility of witnesses * * *."

The defendant moved for acquittal on the charge of involuntary manslaughter. He argued that the evidence was insufficient to sustain a conviction on either of the two theories presented by the state, criminal negligence or misdemeanor manslaughter. We have already addressed the problem with the criminal-negligence theory and have concluded that the necessary legal duty was absent in this case. There was, however, sufficient evidence presented at trial to warrant the misdemeanor-manslaughter theory being submitted to the jury.

In order to find defendant guilty of involuntary manslaughter under the misdemeanor-manslaughter theory, the state must prove two elements beyond a reasonable doubt. It must show first that a misdemeanor occurred and then that such misdemeanor was the proximate cause of the victim's death. An assault is an unlawful attempt or offer, with force or violence, to do a corporal hurt to another, whether from malice or wantonness. *State v. Pope,* 414 A.2d 781 (R.I.1980). A "[b]attery refers to an act that was intended to cause, and does cause, an offensive contact with or unconsented touching of or trauma upon the body of another, thereby generally resulting in the consummation of the assault." *State v. Messa,* 594 A.2d 882, 884 (R.I.1991) (quoting *Proffitt v. Ricci,* 463 A.2d 514, 517 (R.I.1983)). The defendant himself testified that he and Juston were arguing. He admitted to hitting Juston in the head because he was trying to calm him down. He was not positive where on the head he hit Juston but testified that it could have been on the top of the head. A jury could reasonably infer from defendant's own testimony that an assault and or battery occurred.

The state must also show that the blow to Juston's head by defendant was the proximate cause of Juston's death. Testimony by medical experts revealed that Juston had suffered two head traumas before his death. The first may have been caused by the wrestling that Juston and his brother, Jesse, engaged in earlier that night

when he struck his head on a chair. However, both Jesse and the boys' friend, Glenn Gordon, testified that Juston continued playing after he banged his head and appeared to be fine. The autopsy indicated that there were two separate areas of subdural hemorrhage. After hearing all the expert testimony from both sides, a jury could have found that the blow that McLaughlin imposed on Juston's head was a battery and that this blow caused Juston's death beyond a reasonable doubt.

The trial justice denied the motion because he determined that there was enough evidence such that "the jury could find there was an assault and as a result of that assault Juston Ellinwood fell in the water and as a result of falling in the water he became disoriented and that he subsequently drowned because of the initial blow." The trial justice ruled properly on the misdemeanor-manslaughter theory. In our review of the trial court's denial of the motion for judgment of acquittal, we are bound by the same standards that the trial justice must apply. *State v. Simpson,* 611 A.2d at 1393 (citing *State v. Capuano,* 591 A.2d at 36; *State v. Henshaw,* 557 A.2d 1204, 1206 (R.I.1989)). Viewing the evidence presented on the theory of misdemeanor manslaughter in the light most favorable to the state, the jury, making reasonable inferences, could find defendant guilty of involuntary manslaughter under the misdemeanor-manslaughter theory. We agree with the trial justice's findings and affirm the denial of the motion in regard to that theory.

### III

The defendant also challenges the denial of his motion for judgment of acquittal on the charge of entering the residence of Dr. Round with the intent to commit larceny. The defendant maintains that the evidence was insufficient to show that he had, or shared with Juston Ellinwood, the intent to commit larceny at the time he entered Dr. Round's residence. We disagree.

The evidence presented at trial revealed that defendant had known Dr. Round for years and grew up with his children. McLaughlin indicated initially to the police and again at trial that he was aware that Dr. Round was probably traveling. Upon arriving at Dr. Round's house, defendant attempted to gain entry by kicking a door in. When he was unsuccessful, Juston broke a cellar window and entered through the basement. Initially, while Juston was inside the home, defendant testified that he sat at a picnic table in the yard and waited for him. He subsequently entered the house through the same cellar window and remained there until the alarm was triggered. He maintains that he only entered the house to retrieve Juston. The defendant told the police that when he entered the cellar, Juston was at the top of the stairs near the door leading to the first floor. The defendant climbed up where Juston was standing. An alarm was triggered by a blow to the door that provides access to the main floor of the house. McLaughlin testified that when the alarm sounded, the two left through the window. The police investigation revealed that there was indeed an attempt to gain entrance from the cellar to the main floor.

It is undisputed that defendant was in the house and that a World War II frequency box was taken from the house. The defendant argues that it was Juston, not he, who stole the frequency box. However, he did concede at trial that he "might" have assisted Juston in leaving the house with the box. The window they exited from was six or seven feet off the ground, and there was a big oil tank at the window. The defendant is approximately five foot eleven, and Juston was only four foot four and a half inches tall. In his decision on the motion, the trial justice did properly point out that those facts in particular could allow the jury reasonably to infer "that Mr. McLaughlin did go in there to aid and assist either Juston Ellinwood or on his own go in there with the intent to commit larceny." The facts presented at trial were sufficient to implicate defendant in the charge of entering Dr. Round's house with intent to commit larceny, and we affirm the denial of defendant's motion.

## IV

The defendant argues that the trial court erred in its determination that his confession was voluntary and that it should have prevented the jury from hearing it. He also argues that the charge to the jury on how to assess voluntariness did not utilize the standard for determining coercion. We disagree.

McLaughlin's confession given while in the police station on May 2, 1988, was voluntary and not coerced. The defendant was questioned by police in relation to Juston's death on a number of occasions. His incriminating statements arose out of the May 2, 1988 meeting only. On April 2, 1988, the day that Juston's body was discovered, defendant was in police custody for a violation of a restraining order involving his parent's home, which was unrelated to this case. He was subsequently sent to the Institute of Mental Health (IMH) for evaluation. Two days later, on April 4, 1988, Sergeant John David Hornoff of the Warwick police department went to the IMH to inquire about defendant's actions in the preceding days. When defendant indicated that he would rather speak to an attorney first, Sergeant Hornoff left without further questioning, as required.

The next day, on April 5, 1988, McLaughlin was transported from the IMH to the Kent County Courthouse for arraignment in District Court. When he was in the holding area, Inspector Richard Smith interviewed defendant. Inspector Smith was sent to conduct the interview because he was familiar with defendant and was on a first-name basis with him. Prior to the interview Inspector Smith orally informed defendant of his *Miranda* rights. The defendant indicated to Inspector Smith that he understood his rights but wished to continue the interview. The defendant testified at trial that he understood these rights and knew he could stop at any time during the interview. At no time in this conversation before or during the interview with the inspector did he request to speak with an attorney. At trial his explanation for this omission was that he did not want to raise any suspicion by asking for an attorney.

In any case no incriminating statements arose out of this interview. He recounted his activities of April 1 and 2 in detail but omitted ever having been with Juston. When asked specifically if he had any contact with a young boy on a scooter or on a bicycle, he answered no. The interview ended with defendant's providing no incriminating information to the inspector.

Again, on May 2, 1988, defendant found himself in the custody of the Warwick police for another restraining-order violation. As he was in the holding cell in the police station, defendant indicated to Sergeant Hornoff that he wished to speak with Inspector Smith. He was then brought unrestrained to an interview room in the detective division.

Upon his entering the interview room, Inspector Smith first orally apprised defendant of his *Miranda* rights. When asked, defendant responded that he understood each individual right. He was then shown a rights-waiver form. The rights were again read to him. The defendant was then asked to read each right again to himself and initial each one of the rights to indicate that he had read it and understood it. He was informed by Inspector Smith that he was being questioned for the crime of homicide. Above his name on the statement-of-rights form where it stated, "I David McLaughlin am a suspect in the crime of homicide," defendant wrote his initials. He also initialed the lines that stated that "the police have made no threats or promises to me" and "I understand my rights" and signed the consent form in full. At no time prior to the actual interview did defendant indicate that he wanted to assert any of his rights and stop the interview.

When asked again about his involvement in the death of Juston Ellinwood, defendant responded in the negative. Inspector Smith reminded defendant of their previous conversation on April 5 relating to his whereabouts on April 1 and 2 and told defendant that the police had received contradictory information, that he, Smith, had received information from an informant that "his safety was in jeopardy and that

Gary Ellinwood and the family were going to take care of it themselves." Inspector Smith explained at trial that he interpreted the information he received to mean that the Ellinwoods were going to kill McLaughlin. Given their prior police contact and their reputation in the community as a violent family, Inspector Smith was sure that McLaughlin would attach a like interpretation to this information. The defendant testified that this information did in fact cause him to be afraid. He stated that his prior knowledge of the Ellinwood family led him to believe that they would kill him.

It was only after receiving this information that defendant implicated himself in Juston's death. When Sergeant Hornoff left the interview room for a few minutes to get some reports, defendant asked Inspector Smith privately "[W]hat am I looking at * * * for killing Juston Ellinwood?" He was told that murder holds a life sentence. Following this dialogue defendant raised the question of protective custody. Inspector Smith then checked with Detective Captain Burlingame and assured defendant of protective custody in return for his cooperation. McLaughlin then became extremely emotional and began to sob. He embraced Inspector Smith and stated, "I didn't mean to kill him. It was an accident." Inspector Smith gave him a chance to collect his thoughts and then asked defendant to tell him what had happened. The defendant then proceeded to describe the events that took place on April 1 and 2, 1988. Only when Inspector Smith and Sergeant Hornoff requested that he put the confession on videotape did defendant ask to have an attorney present. After an attorney from the office of the Public Defender arrived at the police station, McLaughlin decided not to conduct the videotaped confession.

The defendant argues that the confession that he made to Inspector Smith and again in the presence of Detective Captain Burlingame on May 2 was involuntary. "Both the Rhode Island and the Federal Constitutions bar the use in a criminal trial of a defendant's involuntary statements." *State v. Griffith*, 612 A.2d 21, 25 (R.I.1992) (citing *State v. Amado,* 424 A.2d 1057,

1061 (R.I.1981) (citing state and federal precedent)). This court has held that when reviewing whether a defendant's statement is voluntary or induced by promise or coercion, the totality-of-circumstances test must be applied. *State v. Pacheco,* 481 A.2d 1009, 1026 (R.I.1984).

In determining voluntariness, all of the facts and circumstances must be taken into account "including the behavior of the defendant and the behavior of the interrogators." *State v. Griffith,* 612 A.2d at 25. A statement made by a defendant may be admitted into evidence against that defendant only if the state proves by clear and convincing evidence that the defendant knowingly and intelligently waived his or her rights not to answer questions and have assistance of counsel. *State v. Smith,* 602 A.2d 931, 935 (R.I.1992) (citing *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). In addition to considering all the surrounding circumstances, the state must also demonstrate by clear and convincing evidence that defendant's statements were the product of a free and rational choice and not the result of coercion of any type. *State v. Malone,* 568 A.2d 1378 (R.I.1990).

The trial justice heard and reviewed the evidence at a preliminary hearing as required and concluded that defendant's statements were voluntary. "[A] finding of fact by the trial justice is entitled to great deference on appeal and is not to be disturbed unless it is clearly erroneous." *State v. Pacheco,* 481 A.2d at 1016. After an independent review of the record, we find that the trial justice's determination of voluntariness was well supported by the evidence.

The facts of the instant case do not imply that the statements were made by defendant as a result of a threat or promise. The defendant testified at trial that there was nothing threatening to him about the interview or about being questioned at the police station. He testified that he was well aware of his rights and knew that he could have stopped anytime and asked for an attorney. Inspector Smith and defen-

dant were old acquaintances, and at that time defendant was not confined and expected to be leaving the police station when the interview was over. Nothing indicates that defendant was actively coerced into giving the incriminating statements. In fact defendant testified that he was treated like a gentleman. Inspector Smith testified that he did not expect defendant to confess his involvement in Juston's death after telling him about the information from the informant. Inspector Smith explained that he told defendant of potential harm by the Ellinwoods because he felt he had a moral obligation to do so. It was defendant himself who raised the issue of protective custody to the officers. Protective custody was never offered in exchange for information relating to Juston's death. For these reasons we find that the trial justice's ruling of voluntariness was justified and not erroneous.

█ We now move to the instruction given to the jury. The trial justice adhered to the requirements of this test, though not using the specific language, "totality-of-circumstances" when he instructed the jury.

"When you consider the voluntariness of the confession you must consider all the circumstances and the conduct of the police at the interrogation. If you find that the state has not proven by clear and convincing evidence then you must not consider the statement [defendant] made to the police at that time."

Although this instruction does not completely embody the language "totality-of-circumstances" as adopted in *State v. Pacheco*, it does clearly instruct the jury to consider "all the circumstances." The trial justice also informed the jury of the need to consider the conduct of the police as well. The minor deviation in language, if error at all, is certainly of the most harmless type and did not prejudice the defendant. Arguably, the language used by the judge may have simplified the task of the jury. Although we do not advocate a deviation from the specific test required, this deviation in language is so minor that it does not constitute reversible error as the defendant alleges.

For these reasons the defendant's appeal is denied in part and sustained in part, the judgment of conviction for entering a dwelling with intent to commit larceny is affirmed, the judgment of conviction of involuntary manslaughter is vacated, and the case is remanded to the Superior Court for a new trial on the charge of manslaughter.