DECISION
Before this Court is Defendants Jeffrey and Michael Derderian's ("Defendants") motion to dismiss one hundred counts of a grand jury indictment pursuant to R.I. Super. R. Crim. P. 12.[1]
Defendants were indicted on two hundred counts of manslaughter pursuant to G.L. 1956 § 11-23-3. Defendants leased a building in Warwick, Rhode Island, in which they operated a nightclub named "The Station." On the evening of February 20, 2003, a fire spread throughout The Station, ultimately resulting in the death of one hundred people. The first one hundred counts of the indictment charge the Defendants with involuntary manslaughter resulting from criminal negligence. The second hundred counts charge the Defendants with involuntary manslaughter resulting from the commission of an unlawful act ("misdemeanor manslaughter"). Defendants move to dismiss counts 101-200 of the criminal indictment for failure to state an offense under Rhode Island law and failure to afford adequate warning of the offense in violation of R.I. Const. art. 1, §§ 2, 7, 10, art. 6 § 2 and U.S. Const. amend. V, XIV.[2] Defendants challenge the Grand Jury process because of "excessive" grand juror absence and alleged prosecutorial misconduct.
The basis of the misdemeanor manslaughter counts is the Defendants' alleged failure to follow the mandate of the Fire Safety Code. Specifically, the foam found affixed to The Station's walls after the fire was purportedly not adequately fire resistant, in violation of G.L. 1956 § 23-28.6-15 ("the foam statute"). Allegedly, the Defendants affixed the foam to the walls to muffle the sound created by bands playing within The Station in order to satisfy concerns from neighboring homes. (See Warner, Gr. Jr. Tr.) The State of Rhode Island ("State") posits that the foam was not adequately flame resistant and proximately caused the one hundred deaths.
Defendants filed said motion to dismiss and supporting memorandum (Dismiss), as well as memorandum in response to the State's objection (Reply). The State filed an objection to the motion and supporting memorandum (Objection). Both the Defendants and the State argued before this Court on October 26, 2005 (Hr'g Tr.), and the Defendants filed a Post-Argument Rebuttal. Defendants further filed a supplemental motion to dismiss the counts based on the prosecutor's failure to present allegedly exculpatory evidence in response to a question from a grand juror and conduct relating to a newscast shown to the grand jury. (Supp. Dismiss.) State responded with an objection memorandum. (Supp. Objection.)
 MISDEMEANOR MANSLAUGHTER IN RHODE ISLAND
Section 11-23-3 requires that "[e]very person who shall commit manslaughter shall be imprisoned not exceeding thirty (30) years." It is settled law in Rhode Island that because manslaughter is not defined within the statute, it takes the same meaning as defined in common law. State v. Fenik, 45 R.I. 309,314, 121 A. 218, 221 (1923). Common law also dictates that manslaughter is classified as either voluntary or involuntary.State v. Vargas, 420 A.2d 809, 815 (R.I. 1980).
Involuntary manslaughter in Rhode Island is defined as "an unintentional homicide without malice aforethought committed either in performance of an unlawful act not amounting to a felony or in the performance of a lawful act with criminal negligence." State v. Hallenbeck, 878 A.2d 992, 1008 (R.I. 2005); see State v. Lillibridge, 454 A.2d 237, 240 (R.I. 1982). This definition clearly creates two distinct theories of involuntary manslaughter: one based on criminal negligence theory and one based on unlawful act theory ("misdemeanor manslaughter"). Although the Rhode Island Supreme Court has repeatedly recognized this definition, there are few cases discussing the specific nature of the unlawful act theory of manslaughter. See, e.g., State v. Pedro Ortiz,824 A.2d 473, 485 (R.I. 2003); State v. Wilding, 740 A.2d 1235, 1240
(R.I. 1999); State v. Hockenhull, 525 A.2d 926, 929 (R.I. 1987); State v. Freeman, 473 A.2d 1149, 1151 (R.I. 1984);State v. Kaner, 463 A.2d 1348, 1351 (R.I. 1983). The most instructive misdemeanor manslaughter discussion is found inState v. McLaughlin, 621 A.2d 170, 177 (R.I. 1993). InMcLaughlin, the Rhode Island Supreme Court articulated the two elements that comprise misdemeanor manslaughter. Id. The State "must show first that a misdemeanor occurred and then that such misdemeanor was the proximate cause of the victim's death." Id.McLaughlin was the first Rhode Island case to limit the unlawful act to misdemeanors; it also was the first case to specify that the unlawful act must proximately cause the death.Id.
 SUMMARY OF DEFENDANTS' ARGUMENT
Defendants first contend that the indictment does not state a claim under Rhode Island law. Defendants argue that the State failed to allege the Defendants' committed a misdemeanor, as they find the foam statute both inapplicable to owners and lessees and non-prosecutable for want of penalty. Defendants also assert that the foam statute fails to provide adequate due process protection under both the State and Federal Constitutions.
Additionally, Defendants' find the application of misdemeanor manslaughter to their case to be invalid because the misdemeanor is not allegedly malum in se, which the Defendants' contend is inconsistent with state law. The Defendants' also argue the indictment holds them strictly liable for manslaughter in violation of constitutional protections. Finally, the Defendants attack the process of the indictment itself. They first allege that excessive juror absence is grounds for dismissal. They also attack the prosecutor's failure to present evidence of an anonymous fax, later found to be written by Barry Warner, which they claim to be exculpatory. Defendants also contend that the manner in which a newscast was presented to the grand jury added to the alleged misconduct.[3]
 STATE'S OBJECTION
The State urges the Court to allow the indictment to go to trial. The State argues that the foam statute is a viable vehicle for prosecution because it unambiguously presents a duty for owners and lessees to ensure their place of assembly complies with specific fire standards. The State contends the clear language of the Fire Safety Code not only presents a prosecutable offense under Rhode Island law, but also satisfies constitutional safeguards. The State further alleges that use of the Fire Safety Code violation does not hold the Defendants strictly liable for manslaughter because the element of proximate cause limits the application of misdemeanor manslaughter to unlawful acts that carry some degree of risk of death. The State denies any additional limitations of misdemeanor manslaughter exist under Rhode Island law; the State holds the charge does not require a separate element of mens rea. Finally, the State argues that the juror absence during the indictment proceeding is not fatal to the indictment, nor does the State believe the prosecutors presenting evidence to the jury engaged in misconduct.
 STATE SUFFICIENTLY ALLEGED THE DEFENDANTS' COMMITTED A MISDEMEANOR
The Fire Safety Code is a multi-chapter piece of legislation that specifies a number of fire safety standards. §§ 23-28.1 — 28.39.[4] The Code begins with introductory chapters, which includes definitions for the code, a procedure for implementation and enforcement, and the general penalty statute. See §§ 23-28.1 through 28.6. Following the introductory chapters, the first part of the Fire Safety Code organizes the chapters according to type of establishment. This division allows the legislature to create special rules tailored to the type of facility regulated. See, e.g., § 23-28.7 (hotels and motels); § 23-28.9 (heating and cooking facilities); § 23-28.12 (schools); § 23-28.17 (storage buildings).[5] The Fire Safety Code's organization by facility type allows building owners and lessees to quickly ascertain what specific fire safety measures apply to their type of facility. Division according to type of facility is common in state fire codes. See, e.g., NFPA 1, FirePrevention Code, § 9-26 (1997 ed.).
An owner of a nightclub would find the fire safety requirements for the building they owned or leased in the chapter labeled "places of assembly." Section 23-28.6. The definition of "place of assembly" is found in the introductory chapters, and includes existing facilities that allow for capacity over seventy-five persons and new facilities that allow for capacity over fifty persons. Section 23-28.1-5(79). Among the requirements specific to places of assembly are regulations regarding alarm systems, fire extinguishers, passages for exit, and the requirement to make acoustical and decorative fixtures on walls fire resistant.
The Foam Statute
The Station nightclub allegedly falls within the ambit of Chapter 28.6 because the State asserts the capacity allowed inside the Station was well over seventy-five. (Object 2, n. 2.) ("The State further expects to prove that the prescribed maximum capacity of The Station was 404 persons.") The specific provision in the Fire Safety Code that the Defendants allegedly violated mandates that in a place of assembly, any acoustical material affixed to interior walls must be rendered flame resistant. Section 23-28.6-15 states:
 "Decorative and acoustical material to be flame resistant. — (a) All combustible decorative and acoustical material including curtains, but not including floor coverings shall be rendered and maintained flame resistant in accordance with subsection (d). This regulation shall not be construed to prohibit the use of wall or ceiling coverings affixed directly to the wall or ceiling, which meet the requirements of subsection (e). Furnishing or decorations of an explosive or highly flammable character shall not be used.
 . . .
 (d) . . .
 . . .
 (2) When a doubt exists as to the fire retardant quality or the permanency of the treatment, material shall be subject to the field check test as provided in subsection (d)(3).
 (3) Match Flame Test: . . .
 . . .
 (e) Interior finish in all places of assembly shall be as regulated or modified by the provisions of the description of interior finish in § 23-28.1-5 and shall not exceed the following classifications for the locations indicated:
 (1) In all means of egress Class A.
 (2) In all other rooms or spaces Class C."
The State purports to show that the foam used by the Defendants in The Station was not fire resistant and was, therefore, in violation of the foam statute. The State asserts that the foam fails both the subsection (d) match flame test and also fails to meet the requirements for interior finish outlined in subsection (e). The general penalty provision of the Fire Safety Code provides for prosecution of the foam statute. This general penalty statute reads:
 "Violations of chapter or codes. — Any building owner or lessee who violates or fails or refuses to comply with the provisions of this chapter, the Fire Safety Code, chapters 28.1-28.39 of this title, or any code adopted by the board, or any lawful order of authority having jurisdiction shall be guilty of a misdemeanor and upon conviction thereof shall be fined not more than five hundred dollars ($500) or shall be imprisoned for not exceeding six (6) months, or both so fined and imprisoned for each offense; and each day the violation, omission, failure, or refusal continues shall be deemed a separate offense; provided that any person who shall knowingly make, give, or produce any false statements or false evidence, under oath, to the authority having jurisdiction or to the fire safety board, shall be guilty of perjury. It shall be the authority having jurisdiction to enforce the provisions of this chapter." Section 23-28.3-9.
When read together, the Defendants' alleged failure to render the foam flame resistant would be a misdemeanor. When a statute has a "plain, clear, and unambiguous meaning, no judicial interpretation is required, and the words will be given full effect in accordance with the plain, expressed intent." StateDepartment of Corrections v. Rhode Island State Labor RelationsBd., 703 A.2d 1095, 1097 (R.I. 1997); see Local 400,International Federation of Technical and Professional Engineersv. Rhode Island State Labor Relations Bd., 747 A.2d 1002, 1004
(R.I. 2000). "[I]n enacting a statute the Legislature is presumed to have intended that every word, sentence, or provision has some useful purpose and will have some force and effect." State v.Benoit, 650 A.2d 1230, 1232 (R.I. 1994) (citing State v.Reis, 430 A.2d 749, 752 (R.I. 1981)). When statutes are ambiguous, the court must examine the statutes in "their entirety, and will `glean the intent and purpose of the Legislature "from a consideration of the entire statute, keeping in mind the nature, object, language and arrangement"' of the provisions to be construed." State v. Oliveira, 882 A.2d 1097,1110 (R.I. 2005) (citations omitted). The foam statute unambiguously created a duty on owners and lessees to render acoustical materials flame resistant.
Penalty Statute Provides for Prosecution of the Foam Statute
Defendants contend the foam statute contains no penalty. The Defendants correctly state, "every criminal statute must provide for a penalty and . . . a conviction for a violation of a statute containing none cannot stand." State v. DelBonis, 862 A.2d 760,768 (R.I. 2004) (citations omitted). However, the general penalty statute is applicable to the foam statute through the clear language of the penalty statute. The foam statute is within the span of statutes to which the penalty provision applies; § 28.6-15 is obviously within the span of §§ 28.1-28.39. The Legislature's choice to explicitly include the span of statutes verifies that the intent of the Legislature was for the penalty clause to pertain to the entire Fire Safety Code; it also precludes acceptance of the Defendants' theory that the general penalty clause should not apply to the foam statute.
Defendants' contention that the use of the penalty provision simply fills a "gap" left by the preclusion of penalty in the foam statute itself is without merit. (Dismiss 11, 16, Reply 6.) Defendants cite State v. DelBonis, in which the Court did not correct a legislative error that effectively made conviction of driving under the influence impossible without first determining the defendant's blood alcohol level. 862 A.2d 760, 766 (R.I. 2004).[6] This case is inapplicable to the situation at hand as the penalty clause in DelBonis only referred to intoxication with reference to percentage of blood alcohol. Contrarily, nothing in the penalty clause limits application in a way to prevent the foam statute to be included, and the Defendants' alleged conduct is within the scope of the statutes. The fact that the penalty statute is not in the same physical section is of no consequence to the effectiveness of the penalty statute. The sections and chapters of the Fire Safety Code often do not include a penalty provision within the chapter, but rather rely on the general penalty clause found at the beginning of the Fire Safety Code. See, e.g., § 23-28.7; 28.9; 28.12. Further, it is not uncommon in Rhode Island to include a penalty provision in a separate statute than the statute that describes the prohibited conduct. See, e.g., G.L. 1956 § 21-28-3.18 (Supp. 2005) (prescription of controlled substances statute, applicable penalty statute found in § 21-28-4.02); § 21-31-3 (food, drugs, and cosmetics statute, applicable penalty statute found in §21-31-5); §§ 11-41-1, 4 (larceny statutes, applicable penalty statute found in 11-41-5); § 11-52-4.1 (computer trespass statute, penalty statute found in § 11-52-5); § 11-30-1, 2 (nuisance statute, applicable penalty statute found in 11-30-3); §§ 11-47-7, 33, 52 (weapons statute, applicable penalty provision found in § 11-47-26). Defendants cite to no Rhode Island case that would render the use of a penalty statute ineffective because the physical location of the penalty language does not appear in the body of the section prohibiting the specified conduct. Finding the general penalty provision to be null would not be an exercise of leniency toward the Defendants; rather, it would be an exercise of statutory revision. Thus, the general penalty provision must apply to the foam statute.
Language used in the Foam Statute and Penalty Provision Createsa Duty on Owners and Lessees of Places of Assembly
The Defendants also assert: "the language of the statute was phrased entirely in the passive voice and speaks to the nature of the material encompassed within the statute and not to the conduct of any individual. . . . There is nothing in the statute that identifies or describes any criminal act, nor is there any penalty provision set forth in the statute itself." (Dismiss at 15, 17.) Essentially, the foam statute mandates acoustical material be rendered flame resistant, but does not specifically state who is to render the material flame resistant. G.L. 1956 § 23-28.5-15(a). However, the penalty provision makes it clear that the owners and lessees of the building are responsible for code compliance. The penalty provision specifically states: "Any building owner or lessee who violates or fails or refuses to comply with the provisions of this chapter . . . shall be guilty of a misdemeanor." Section 23-28.3-9. Further, the clear language of the penalty clause is consistent with the statutory scheme, as well as common sense. Lessees and owners operate the building and are the ones who have control over the premises, allowing them to be in the position to render the building fire safe.[7] Use of a passive tense may not be the most grammatically desirable manner to craft a criminal statute, but it certainly is not unusual or so disorienting as to render the entire statute vague. The verb tense chosen by the Legislature cannot be used to circumvent their intent. Therefore, the foam statute creates a prosecutable misdemeanor under Rhode Island law.
Defendants' Alleged Conduct Falls Within the Ambit of theStatute Without Notice
Defendants contend that the State's failure to allege that local fire officials previously notified the Defendants of the foam's noncompliance mandates the Court dismiss the counts. (Dismiss 19-20.) However, there is nothing regarding notice or opportunity to cure in the general penalty statute and no added notice requirement appears in the chapter that applies to places of assembly. The penalty statute lists two separate ways a misdemeanor is committed: 1) violation of provisions of the chapter, or 2) failure or refusal to comply with provisions of the chapter. Section 23-28.3-9 ("Any building owner or lessee who violates or fails or refuses to comply with the provisions of this chapter . . . shall be guilty of a misdemeanor.") (emphasis added). If the General Assembly had intended for notice to be a prerequisite for prosecution, the only punishable offense listed would have been failure or refusal to comply with any lawful order of authority having jurisdiction. "No authority exists for this Court or the trial court in a criminal case `to supplement or to amend a statute enacted by the General Assembly.'" Statev. DelBonis, 862 A.2d at 768 (quoting State v. Carter,827 A.2d 636, 644 (R.I. 2003)). Thus, the Court will not add notice as a required element for prosecution of the foam statute.[8]
The Defendants' discussion of the local official's enforcement customs, which encourages voluntary compliance, is irrelevant to the question of whether notice is mandatory under the statute. (Dismiss 19.) The Defendants point to no Rhode Island case, statute, or agency rule that requires the custom of giving notice before a violation creates a mandate for notice before prosecution.[9] That fact that the State Fire Marshal — as opposed to local fire officials — is responsible for enforcement of the Fire Code does not mean the Attorney General would be powerless to prosecute violations of the Fire Code where local officials had not previously cited the violations. The Court also notes requiring notice previous to prosecution of Fire Code violations would create results contrary to the purpose of the Fire Code.[10] The Supreme Court of Rhode Island has recognized the importance of abating fire hazards by allowing warrantless searches in emergency situations. See Vaill v.Franklin, 722 A.2d 793, 796 (R.I. 1999).
Defendants argue that the presence of §§ 23-28.5-1 to 28.5-3 ("inspection statutes") renders the foam statute an inspection guideline rather than an affirmative duty for operators of places of assembly. (Dismiss 17-19.) When an inspector finds accumulated material, the offender has an opportunity to cure before prosecution. Section 23-28.5-2. However, the Defendants appear to ignore the fact that the inspection statutes deal solely withaccumulated material.[11] These statutes are intended to apply to situations were combustible materials are allowed to build-up within any type of building. It is sensible that the legislature would provide for notice and an opportunity to cure such build-up of material before noncompliance is prosecuted, as the statute would apply to a greater scope of individuals, some which might not be in business or aware of business practices, and because accumulation accrues over time. Contrarily, the foam statute applies only to the flame resistance of acoustical and decorative materials in places of assembly. The two statutes do not conflict; the inspection statutes apply to quantity of combustible materials in any building and the foam statute applies to the quality of flame resistance necessary for decorative and acoustical material in places of assembly. The State does not allege the Defendants allowed the foam to accumulate; rather the State alleges the material affixed to the wall was not flame resistant as required by statute. Therefore, the foam statute applies to the alleged offense, not the inspection statute. Although the Court is mindful that a penal statute must be liberally construed in favor of the accused, the Defendants do not assert a viable interpretation of the statute because nothing in the statute prohibits the Attorney General from prosecuting a violation discovered after the event of a fire. The requirement of notice is simply not in the language of the Fire Code.
Foam Statute is Constitutional
"[I]n deciding `whether a defendant's conduct is within the ambit of the statute,' while according the defendant `the benefit of any reasonable doubt,' . . . we are also constrained by the `constitutional requirement for certainty in penal statutes.'"State v. Oliveira, 882 A.2d 1097, 1110 (citations omitted). The Defendants essentially argue that the Court must read the statute to require notice before criminal prosecution because without such notice Defendants' would not have been given "fair warning" afforded by the Constitution. (Dismiss 20-22.) The constitutional mandate for fair warning is founded upon our system's concept of fairness. "If a criminal act is set forth in a statute in uncertain terms, the innocent may be trapped by inadequate warning of what the state forbids." State v. Authelet,120 R.I. 42, 45, 385 A.2d 642, 644 (R.I. 1978).
"Basic due process provides that no man shall be held criminally responsible for conduct that he could not reasonably understand to be proscribed." State v. Ibbison, 448 A.2d 728,733 (R.I. 1982) (quoting United States v. Harriss,347 U.S. 612, 617 (1954)). A criminal statue "must contain a description or definition of the act or conduct which comprises the offense contemplated therein stated with legal certainty." Oliveira,882 A.2d 1097, 1110; State v. Brown, 97 R.I. 115, 119,196 A.2d 133, 136 (1963). "The standard employed to gauge whether a particular statutory term reasonably informs an individual of the criminality of his conduct is whether the disputed verbiage provides adequate warning to a person of ordinary intelligence that his conduct is illegal by common understanding and practice." State v. Fonseca, 670 A.2d 1237, 1239 (R.I. 1996) (citing State v. Authelet, 120 R.I. 42, 45, 385 A.2d 642, 644
(1978)).
Mindful of these principles, the Court sees no merit in Defendants' challenge to the constitutionality of the foam statute. As discussed previously, the Court finds the language of the Fire Code unambiguously placed the Defendants on notice that their alleged failure to render the foam flame resistant was a violation of the law. The Court also finds no merit in the Defendants' argument that § 23-28.3-5 indicates the code scheme or language is confusing. Section 23-28.3-5 simply states that if a building owner needs advice or assistance in complying with a section of the Fire Safety Code, they may consult with the authority having jurisdiction. If anything, this statute creates a duty on building owners to ascertain the meaning of the statutes and ask questions if any doubts exists as to how to comply with the code. The duty in the Fire Safety Code is clear. Ignorance of the law is no excuse.[12]
The Court has no doubt that the Defendants should have been aware there was a duty to render the nightclub at least minimally fire safe. "With the growth of railroads, the use of automobiles, manufacturing industries, crowded living conditions in urban centers, and many other social and economic hazards, the statutory law in this country concerning public safety and protection of citizens against possible injury assumed a role of ever-increasing importance." Sutherland Statutory Construction
§ 73:3 (2003 ed.). The promulgation of fire safety rules that placed responsibility on individuals' controlling premises, dates back to colonial America and continued to flourish with the growth of major cities. See National Fire Protection Association, Fire Protection Handbook § 3-1 (19th ed. 2003). The concern for fire safety in places of public assembly has been especially significant, as the major fire tragedies in this country involved places of assembly, including the 1942 Cocoanut Grove nightclub fire in Boston, Massachusetts. Id. at § 2-28;Commonwealth v. Welansky, 316 Mass. 383, 55 N.E.2d 902 (Mass. 1944) (owner of nightclub convicted on 413 counts of reckless manslaughter because of unsafe fire conditions). Further, the requirement that interior finish materials be rendered flame resistant, including decorations and acoustical material, is common throughout the nation. Fire Protection Handbook, § 12-56. Both the historical basis and society's awareness of fire safety issues would clearly defeat any contention that the Defendants' were excusably unaware of their duty to act. Further, nothing about the Rhode Island statute is ambiguous or unusual.
Culpability of the Fire Code Misdemeanor
The goal of safety in the Fire Safety Code is important enough to criminalize violations with no requirement of criminal mensrea. Strict criminal liability is not necessarily a denial of due process. State v. Gilman, 291 A.2d 425, 429-430 (R.I. 1972); see Smith v. California, 361 U.S. 147, 150 (1959). This Court has recognized the trend that
 "[s]ince the turn of the century, there has been an increasing tendency to impose criminal sanctions without regard as to whether the accused knew his actions were prohibited or illegal. This has come about by the legislative regulation of various industries, trades or activities that affect the public's heath and safety." Gilman, 291 A.2d 425, 430.
The Court does not doubt that the Fire Code withstands constitutional scrutiny; the risk of injury and death posed to the general public justifies strictly criminalizing noncompliance. Nightclubs present especially dangerous situations because patrons may be less aware of their surroundings; the lighting may be dim, the atmosphere may be smoky and loud, and the patrons may be consuming alcoholic beverages which could affect their reaction time and judgment. The relatively small misdemeanor penalty attached to a Fire Code violation is justified to ensure compliance in the interest of public safety.
 STATE SUFFICIENTLY ALLEGED DEFENDANTS COMMITTED MISDEMEANOR MANSLAUGHTER
Whether a Fire Code violation could serve as the requisite misdemeanor for a manslaughter conviction is a novel question in Rhode Island. Defendants urge the Court to dismiss the indictment for misdemeanor manslaughter because the charge is based on the violation of the foam statute. The Court disagrees with the Defendants contention that the degree of criminal culpability implied in a misdemeanor manslaughter charge is not great enough to withstand constitutional scrutiny and to coincide with Rhode Island case law. "In determining whether there is proof of conscious risk creation, a distinction must be drawn between unlawful and lawful acts resulting in homicide. The commission of an unlawful act is evidence of conscious risk creation. But a person engaged in performing a lawful act is ordinarily not conscious of creating substantial and unjustifiable risk, and ordinarily, therefore, a greater degree of proof of conscious risk creation will be necessary." Bailey Rothblatt, Crimes ofViolence: Homicide and Assault, § 585 (1973). This was the reasoning that formed the basis of the misdemeanor manslaughter theory of involuntary manslaughter.
Proximate Cause Requirement Invokes Criminal Culpability andPrecludes Strict Liability
Holding an individual strictly liable for manslaughter presents different implications than holding an individual strictly liable for a misdemeanor. As the Court pointed out in Gilman,
penalties for strict criminal liability offenses are relatively small and do not create a grave impact on the violator's reputation or liberty. Gilman, 291 A.2d at 430. Indeed, the Supreme Court of the United States has articulated that a state's power to establish strict criminal liability is not without limitation. Id.; Smith v. California, 361 U.S. 147 (1959). Manslaughter presents a serious penalty of not more than thirty years. Section 11-23-3. Because of the severity of the penalty attached to manslaughter, it would be unjust for the Defendants to be strictly liable for all deaths resulting from a Fire Code violation within their nightclub. However, the Rhode Island Supreme Court has already limited misdemeanor manslaughter in a modern case, avoiding this unjust result.
In State v. McLaughlin, the Rhode Island Supreme Court articulated that proximate cause is an element imbedded within the crime of misdemeanor manslaughter. 621 A.2d 170 (R.I. 1993). In McLaughlin, the Court states "[i]n order to find defendant guilty of involuntary manslaughter under the misdemeanor manslaughter theory, the state must prove two elements beyond a reasonable doubt. It must show first that a misdemeanor occurred and then that such misdemeanor was the proximate cause of the victim's death." Id. at 177 (emphasis added). AlthoughMcLaughlin was not decided on misdemeanor manslaughter grounds, the Rhode Island Supreme Court's discussion of misdemeanor manslaughter is enlightening and persuasive; it is consistent with current criminal law reasoning in Rhode Island and is the only recent Supreme Court discussion regarding the limitations of misdemeanor manslaughter.
The requirement that the illegal conduct proximately cause the manslaughter eliminates concerns of strict liability, as the conduct must be of the type that could proximately cause death. LaFave's Substantive Criminal Law identifies how states have limited the use of misdemeanor manslaughter through proximate cause. Section 15.5(c) at 803-806 (2d ed. 2003).[13] States which still adhere to the malum in se/malum prohibitum
distinction generally do not require proof of proximate cause if the misdemeanor is malum in se. Id. Those states that make the malum in se/malum prohibitum distinction apply the three basic methods to limit the underlying misdemeanor when the misdemeanor is malum prohibitum. Other states use the same three methods, but apply them to all misdemeanors, not just ones that are malum prohibitum. The three variations are: 1) the unlawful act must proximately cause the death, 2) the unlawful excess must proximately cause the death, or 3) the unlawful act must amount to criminal negligence. Id. The Court inMcLaughlin adopted the first position, as it states the criminal conduct must proximately cause the death. Further, no distinction was made in the opinion between malumprohibitum/malum in se misdemeanors. Moreover, manslaughter resulting from criminal negligence is clearly a separate theory of manslaughter in Rhode Island. See Wilding, 740 A.2d at 1240;McLaughlin, 621 A.2d 170, 177. In explaining how proximate cause limits the use of misdemeanors, LaFave states:
 "[Defendant] is not guilty unless the death which occurs is the foreseeable or natural consequence of the defendant's unlawful conduct . . . it is not necessary that death to this particular victim, occurring in this particular manner, be foreseeable; it is enough that the victim be a member of an endangered class, and that his death come about in a foreseeable, rather than an extraordinary, way. Section 15.5(c) at 804.
The proximate cause limitation is perfectly consistent with the Rhode Island Supreme Court's reasoning in other criminal cases. In State v. Benoit, the defendant, while intoxicated beyond twice the legal limit, was driving in the high-speed.650 A.2d 1230, 1231 (R.I. 1995). A car carrying one passenger, driving in the opposite direction of the defendant, crossed the dividing line and hit the defendant. Id. The passenger in the other car was killed and the driver of the other car was injured. Id. The defendant was charged by way of information with § 31-27-2.2 and § 31-27-2.6.[14] Id. at 1230-1231. These statutes appeared to create a strict liability standard if an intoxicated defendant was operating a vehicle and death or injury resulted from such operation. Plainly, the operation of the vehicle was a "but for" cause of the accident; without the defendant's presence on the highway, no accident would have occurred. However, the Court held proof that the manner of operation proximately caused the death was necessary. Id. at 1234. In terms of proximate cause, the simple fact that the defendant was intoxicated while driving did not make it foreseeable that a car traveling at a high rate of speed would cross the center divider and strike the defendant's car. Because the State admitted that it could not prove the defendant's truck was anywhere but in its lane and only alleged the mere presence of the car on the highway, the court dismissed the counts. Benoit,650 A.2d at 1234. The Benoit Court rejected the State's theory of strict liability and embraced the limitation that proximate cause must be shown between the manner of operation and not just the operation itself. Id. at 1233-1234.[15] The Court also clarified that no showing of negligence or recklessness was necessary to convict under the two statutes. Id. at 1233. Sensibly, a harmless misdemeanor could not serve as the proximate cause of a death because death is not the natural consequence of harmless action.
Proximate Cause Inquiry is Fact-Intensive
With respect to the proximate cause inquiry, State v. Benoit
is also significant because of the Court's focus on the facts of the case, not the general category of the crime. Drunk driving is a crime that the Court blatantly considered to be conduct that proximately causes death. Id. 1232. ("We note that the amount of human carnage resulting from alcohol-related motor vehicle accidents is horrific.") However, the Court did not consider whether the category in which the conduct was classified could proximately cause the crime, but rather looked to see if defendant's specific actions proximately caused the crime. Similarly, when a defendant is charged with second-degree murder based on a death resulting in the commission of a non-enumerated felony, the Rhode Island Supreme Court looks to the manner in which the crime is committed. When considering if the non-enumerated felony could underlie a second-degree murder conviction, the Court stated that
 "the better approach is for the trier of fact to consider the facts and circumstances of the particular case to determine if such felony was inherently dangerous in the manner and the circumstances in which it was committed, rather than have a court make the determination by viewing the elements of a felony in the abstract. . . . A number of felonies at first glance would not appear to present an inherent danger to human life but may in fact be committed in such a manner as to be inherently dangerous." State v. Stewart, 663 A.2d 912, 919 (R.I. 1995).
The Defendants' contention that malum prohibitum crimes should be categorically excluded without inquiry into the specific facts would be contradictory to the reasoning of the Rhode Island Supreme Court. The inquiry of this Court should not be whether a Fire Code misdemeanor can underlie a misdemeanor manslaughter conviction, but whether the Defendant's alleged unlawful failure to render the foam flame resistant could create a foreseeable risk of death. Although the Defendant had a statutory duty avoid using acoustical material that was not flame resistant, doing so does not automatically mean the conduct made death foreseeable. The facts alleged thus far indicate that the ignition of pyrotechnics inside The Station nightclub might constitute an intervening cause of death or the nature of the foam sale may have made the flammability of the foam and, therefore, the death unforeseeable. Proximate cause and knowledge are facts for the jury to decide and are not appropriate for this Court to address in a motion to dismiss counts of an indictment.
Proximate Cause Requirement Sufficiently Invokes CriminalCulpability Consistent with Rhode Island Case Law andConstitutional Considerations
Although this Court believes strict liability for manslaughter would raise constitutional concerns, the State is not alleging strict liability. The United States Supreme Court has stated "[a] relation between some mental element and punishment for a harmful act" is inherent in the criminal law tradition.Morrisette v. United States, 342 U.S. 246, 250-251 (1952) (emphasis added). The Defendants' citations to Rhode Island law cases only support the argument against strict criminal liability for serious crimes. However, none of these cases would support the Defendants' contention that the underlying misdemeanor should be malum in se or requires greater culpability than that created when an unlawful act risks death in a foreseeable manner. Defendants join in the argument of their Co-defendant Daniel Biechele, who alleges the reasoning in State v. Tobin requires an additional or heightened mens rea requirement. 602 A.2d 528
(R.I. 1992) (Hr'g Tr. 15, 8.) In Tobin, the Rhode Island Supreme Court ruled that proof of sexual contact alone could not be support a second-degree sexual assault conviction, but rather the State must show that the contact was for the defendant's sexual gratification. Id. at 535.
The Court initially notes that the logic of Tobin applied to strict liability crimes. As noted above, the State does not seek to hold the Defendants strictly liable. Further, sexual assault is a crime of specific intent. Clearly, misdemeanor manslaughter is not a crime of specific intent; if the Defendants had specifically intended to harm or kill the victims in this case, the Defendants would have been charged with the greater crime of murder. Beyond these distinctions, the Rhode Island Supreme Court has already rejected the extension of Tobin in State v.Yanez, 716 A.2d 759 (R.I. 1998). In this statutory rape case, the Yanez Court firmly rejected the defendant's argument thatTobin should be interpreted to mandate mens rea as to the age of the victim. Id. 768-769. The Rhode Island Supreme Court chose to construe the reasoning of Tobin narrowly.[16]
No Additional Elements Applicable
This Court believes that the indictment sufficiently meets the modern day requirements of misdemeanor manslaughter articulated in McLaughlin.[17] Because McLaughlin and other recent Rhode Island criminal law cases fail to adhere to the malum inse/malum prohibitum distinction, this Court does not believe it is necessary or appropriate to add any additional requirements to the crime of misdemeanor manslaughter. Proximate cause implicates a culpable mental state; a separate element for criminal culpability is not required.
Defendants further argue that State v. De Fonti requires the Court to add a separate requirement that the underlying misdemeanor be malum in se. 34 R.I. 51, 82 A. 722 (1912). However, De Fonti is simply an early case from which the modern concept of criminal mental culpability has evolved. The Court initially notes that De Fonti is now nearly ninety years old and took place during a legally and factually different era. Nevertheless, the Court is also mindful that a case should not be rejected merely because of its age, as many cases become even more authoritative because they have withstood the test of time.State v. Edwards, 810 A.2d 226, 236 (R.I. 2002) (See, eg.,Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L. Ed. 60 (1803)). Unlike many time-tested historical cases, the Supreme Court has never cited De Fonti in the ninety-plus years since the Court handed the opinion down. When the Supreme Court considers previous cases, a single case may have compelling force but courts are generally more constrained to follow a rule of law that has been declared by a series of decisions rather than by one standing alone. St. Germain v. Lapp, 72 R.I. 42, 51,48 A.2d 181 (1946). However, this Court has no intention of purporting to overrule the holding and direct reasoning of DeFonti. When the language of De Fonti is read within its historical context, the opinion's thrust is directly consistent with this decision.
De Fonti is a short rescript in response to four certified questions. The defendants in De Fonti were charged with common law manslaughter in separate cases, both for selling liquor mingled with wood alcohol, a deadly substance.[18] Id. at 52-53, 722-23. In both cases, the victims died as a result of drinking what was supposed to be whiskey, ordered from the separate defendants. Id. at 54-55, 724. The Superior Court asked for clarification as to what particular facts must be included in the indictment for negligent manslaughter and unlawful act manslaughter.[19] Id. at 54-55, 722-723. The relevant holding of De Fonti was that manslaughter based on the sale of wood alcohol requires the State to prove the defendant had knowledge of the poison; this ruling was later codified.[20] The Court cited the doctrine that "[b]y the innocent administration of poison no penal law is violated, no moral turpitude is shown. To hang a man for such a mistake, or incarcerate him for life, is a barbarity not inflicted by the law of any civilized and enlightened people." Id. at 56, 724 (citing Moynihan v. State, 70 Ind. 126, 130). This underlying reasoning that some criminal mens rea must underlie a homicide conviction has already been recognized by this Court and is supported by other binding precedents.
The De Fonti Court discusses a few hypothetical situations classifying some crimes as malum prohibitum and malum in se,
to provide illustrations of how accidental behavior should not be punished by misdemeanor manslaughter. Id. at 55-57, 724. It is these hypothetical situations that the Defendants hope to analogize with their own situation. The De Fonti Court states the unlicensed practice of medicine and unlicensed shooting of a gun should be malum prohibitum and unavailable for manslaughter conviction if death resulted. Id. at 724. This dicta is best understood in the light of the times, as shooting a gun and practicing medicine were not considered to be the dangerous enterprises recognized by modern day society.[21] Just fourteen years later, the Supreme Court stated that "[m]anslaughter may consist, among other things, of doing an unlawful act resulting in unintentional killing, such as violation of motor vehicle laws or administration of drugs to procure an abortion." State v. McVay, 47 R.I. 292, 295,132 A. 436, 438-439 (1926). As society's sophistication has increased, the need and recognition of safety-oriented legislation has become significantly more important. Therefore, De Fonti's use of these hypothetical examples must be viewed as illustrating behavior that at the time was considered to be morally blameless. Now such behavior is considered to be more dangerous.
Initially inquiring whether a misdemeanor is malum prohibitum
or malum in se on its face is simply neither required by Rhode Island law nor is it consistent with modern day criminal law reasoning. When considering whether to suspend a retiree's pension, the Supreme Court of Rhode Island stated:
 "It may well be true . . . that Romano `committed no evil' when he feathered his retirement nest with over $100,000 in illegal public retirement benefits. But whenever possible, we prefer to leave judgments about the good or evil that men do to a much higher and infinitely more prescient court than this one. What we do know, however, is that Romano's deft `double dipping' was contrary to state law. And whether his conduct in arranging to receive this money is labeled good or evil, malum in se or malum prohibitum, the fact remains that, at the end of the day, he not only sought but also obtained tens of thousands of dollars in publicly funded retirement benefits that he was not entitled to receive. Thus, his moral culpability in securing this illicit pension lucre is irrelevant to our legal condemnation of his actions. We hasten to add, however, that his behavior in obtaining and maintaining this illegal stream of pension bounty was hardly blameless. Thus, the dissent's heartfelt identification with Romano's pension plight tends to ignore or, at the very least, to minimize the extent to which Romano himself was responsible for obtaining these ill-gotten gains, and to undervalue the public benefit of recovering this money for the system to use in paying legitimate pension benefits to other retirees." Romano v. Retirement Bd. of the Employees' Retirement Sys., 767 A.2d 35, 38-39 n. 3 (R.I. 2001).
Although Romano v. Retirement Bd. is not a criminal case, it illustrates how the malum in se concept is viewed by the Rhode Island Supreme Court. Other jurisdictions and scholars alike have recognized the outdated nature of the classification.[22]
The Defendants lastly contend that "[p]articulary on these facts such as these — where the foam was allegedly ordered as `sound foam' from an experienced salesperson and where the local code enforcement official inspected and approved the premises on multiple occasions it is particularly unfair to hold these Defendants liable for homicide based on the post-hoc enforcement of this provision." (Reply 10.) True or untrue, this contention is a completely factual one. The nature and reasonableness of the Defendants' alleged reliance is a question for the jury to consider. It is sufficient to say at this time that the indictment does not present any facial constitutional concerns based on the vagueness of the statute or vagueness in the misdemeanor manslaughter rule.
This Court declines to dismiss the misdemeanor manslaughter counts on their face by creating a new judicial rule creating categorical limitations on the type of misdemeanor the State could use as the basis of a manslaughter charge.[23] As this issue has not been presented to the Supreme Court of Rhode Island, it would be their prerogative to use these facts to further limit misdemeanor manslaughter if the court was so inclined. This Court notes that misdemeanor manslaughter has fallen into disfavor on a national level, and has been criticized as being harsh and archaic. However, it remains a viable cause of action in this jurisdiction. The Court leaves any further review and/or limitation to the Supreme Court of Rhode Island.
 GRAND JURY PROCEEDING
Rhode Island maintains a traditional view of the grand jury process, holding the secrecy surrounding the grand jury process and the ultimate decision of the grand jury whether or not to indict a defendant in high regard.[24] "The grand jury has always occupied a high place as an instrument of justice in our system of criminal law." John Doe Grand Jury Proceedings,717 A.2d 1129, 1134 (R.I. 1998). It is the position of the Supreme Court of Rhode Island that
 "`[i]n this country, as in England of old the grand jury has convened as a body of laymen, free from technical rules,' a group of individuals who are `free to make their presentments or indictments on such information as they deemed satisfactory.' Rhode Island, unlike some jurisdictions, has continued to adhere to the traditional grand jury model. This Court has declined to micro-manage grand jury procedures in the past, and we decline defendant's invitation to do so at this time." State v. Franco, 750 A.2d 415, 419 (R.I. 2000) (quoting Costello v. United States, 350 U.S. 359, 362 (1956)).
As such, "a trial justice should honor an indictment returned by a legally constituted grand jury and trial in the Superior Court should proceed thereon." State v. DiPrete, 682 A.2d 1373, 1375
(R.I. 1996). Rhode Island adheres to the United States Supreme Court's position that "an indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for a trial on the merits." State v. Romano, 456 A.2d 746, 753 (R.I. 1983) (citing Costello v. United States, 350 U.S. 359, 363
(1956)).
The grand jury serves the two interrelated functions of investigating and indicting. State v. Guido, 698 A.2d 729, 735
(R.I. 1997).[25] Grand jury proceedings are considered to be a one-sided affair that affords prosecutors great latitude in their comments. State v. Mainelli, 543 A.2d 1311, 1313 (R.I. 1988). "[I]t has traditionally been the function of the grand jury to decide whether the evidence presented to it, unexplained and uncontradicted, gives rise to sufficient quantum of proof to warrant the return of a formal accusation of crime." State v.Acquisto, 463 A.2d 122, 126 (R.I. 1983). One of the reasons for such deference is the recognition that
 "If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merit a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment." Acquisto, 463 A.2d at 127
(quoting Costello v. United States, 350 U.S. 359, 363 (1956).
In order for this Court to dismiss the indictment based on a defect in the grand jury proceeding, there would have to be extreme circumstances. See State v. Romano, 456 A.2d 746, 750 (1983).
Grand Juror Absences
Defendants first challenge the grand jury process because of alleged "excess" juror absences. (Dismiss 22-23.) (referencingDerderian Motion to Show Cause and related arguments.) No Rhode Island case or statute mandates that a grand juror must attend every grand jury session or limits the amount of absences which a grand juror is afforded. Court rules state at least thirteen jurors must be present to vote for the indictment. Section12-11.1-1; R.I. Super. R. Crim. P. 6(a). Rhode Island Court rules also specify:
 "(2) Motion to Dismiss. A motion to dismiss the indictment may be based on objections to the array or on the lack of legal qualification of an individual juror, if not previously determined upon challenge. An indictment shall not be dismissed on the ground that one or more members of the grand jury were not legally qualified if it appears from the signatures which appear on the indictment pursuant to subdivision (f) of this rule that twelve (12) or more juror, after deducting the number not legally qualified, concurred in finding the indictment." R.I. Super. R. Crim. P. 6(b)(2)
Twenty of the twenty-two jurors on the grand juror panel voted to indict the Defendants; one juror voted against the indictment and one juror was absent for the vote. Because Rule 6(b)(2) allows for subtraction of disqualified jurors without dismissing the entire indictment, the Court will only look to the infirmity of the twelve jurors who had the best attendance. Four jurors who voted to indict were never absent, seven jurors were absent once, and four jurors were absent two times.[26] Essentially, this Court would have to dismiss the counts if two absences out of a thirty-five day grand jury trial would render a juror unqualified to vote on the indictment. This Court holds that this minimal amount of grand juror absence does not disqualify a grand juror.
Because Rhode Island adheres to the view that the grand jury proceeding is a one-sided affair where the prosecution does not have a duty to present exculpatory evidence, a strict juror attendance policy is unnecessary to ensure the defendant receives a fair grand jury trial. See State v. Acquisto, 463 A.2d 122,127 (R.I. 1983). The absent juror fails to hear the inculpatory evidence presented that day, thereby disadvantaging the State. We join with other courts that have rejected dismissing an indictment when confronted with a challenge based on juror absence;[27] this Court subscribes to the sentiments of the Seventh and Ninth circuit courts:
 "The Fifth amendment bestows upon grand jurors a heavy responsibility, but lacking evidence to the contrary, courts must presume that grand jurors have properly performed their duties. See Ostrer v. Aronwald, 567 F.2d 551, 553-554 (2d. Cir. 1977). Courts must also presume that a grand juror who votes to indict an individual on a particular count has heard sufficient evidence to believe that a trial on the count is warranted. Id. [Defendant] cited no authority, and we have found none, which even suggest that the Fifth Amendment requires the abandonment of this presumption unless a grand juror has heard all
the evidence presented by the prosecution." United States v. Lang, 644 F.2d 1232, 1238 (7th Cir. 1981); United States v. Leverage Funding Systems, Inc., 637 F.2d 645, 649 (9th Cir. 1980).
Massachusetts echoed this sentiment when it recently considered the effect of juror absence, quoting Honorable Justice Learned Hand:
 "Since all the evidence adduced before a grand jury — certainly when the accused does not appear — is aimed at proving guilt, the absence of some of the jurors during some part of the hearings will ordinarily merely weaken the prosecution case. If what the absentees actually hear is enough to satisfy them, there would seem to be no reason why they should not vote. Against this we can think of nothing except the possibility that some of the evidence adduced by the prosecution might conceivably turn out to be favorable to the accused, and that, if the absentees had heard it, they might have refused to vote a true bill. No one can be entirely sure that this can never occur; but it appears to us so remote a chance that it should be left to those instances in which it can be made to appear that the evidence not heard was of that character, in spite of the extreme difficulty of ever proving what was the evidence before a grand jury." State v. Wilcox, 767 N.E.2d 1061, 1064
(Mass. 2002) (citing United States ex. rel. McCann v. Thompson, 144 F.2d 604, 607 (2d. Cir. 1944)).
As Rhode Island undoubtedly adheres to the traditional view of the grand jury, Defendants' argument that two absences disqualifies a juror is unavailing. Any other holding would create a huge burden and delay in the grand jury process as grand juror absence is common. See Beale, et. al., Grand Jury Lawand Practice § 4:8, at 4-36 (vol. 2, 2004) ("It is not unusual for individual grand jurors to miss a number of sessions, yet participate in the ultimate decision whether to indict or not.").[28] This result would ultimately run contrary to the mandate of the Rhode Island Supreme Court to decline micromanagement of the grand jury process. Acquisto,463 A.2d at 127. The Court must presume that the decision to indict was based on independent juror decisions.
Prosecutorial Misconduct
Defendants assert the prosecutor's failure to present a fax in response to a grand juror question and the manner of presentation of a newscast video interfered with the Grand Jury's functions assigned by Art I. § 7 and state law. "Due process rights include a guarantee of impartiality that is as applicable to grand-jury deliberations as it is to petit-jury deliberations." Romano,
746 A.2d 750. However, "[f]or prosecutorial misconduct to constitute a due-process violation, it must be `of sufficient significance to result in the denial of the defendant's right to a fair trial.'" Bustamante v. Wall, 866 A.2d 516, 525 (R.I. 2005) (citing Greer v. Miller, 483 U.S. 756, 765 (1987)). Defendants not only assert the "prosecutorial misconduct" warrants dismissal of the one hundred counts of misdemeanor manslaughter, but also contend the conduct mislead the jury to such an extent to warrant dismissal of the entire indictment.
Barry Warner's Anonymous Fax
On May 28, 2003, prosecutors received an anonymous fax regarding the practices of American Foam Company, the company from which the Defendants' allegedly purchased the foam ("Fax"). The Fax accuses the company's president and associates of poor character in their personal lives and also asserts the company had a policy of providing their customers with little information regarding their products. (See Fax). During a November 3, 2005 interview with Barry Warner (Warner), a former employee of the American Foam Company, Warner admitted to authoring the Fax. (See Warner In. Tr. 1-2). Warner previously testified before the Grand Jury on June 4, 2003. Defendants assert that the State should have deduced that Warner wrote the Fax before the Grand Jury testimony, which would have allowed Warner to testify more extensively about American Foam Company's policies and also would have allowed the grand jurors to specifically question Warner regarding the Fax. (Supp. Dismiss 5-6.)
The Fax totals eight pages, including the cover page; only a page and a half of the Fax might be considered favorable to Defendants. The Fax alleges American Foam Company was:
 ". . . A COMPANY THAT IS WELL AWARE OF THE DANGERS OF POLY URETHANE FOAM.
 THIS IS A COMPANY THAT DID LITTLE TO EDUCATE THEIR EMPLOYEES ABOUT THE LIMITS OF POLYURETHANE FOAM. IN FACT, THEY DID THE OPPOSITE.
 THIS IS A COMPANY THAT DID NOT WANT TO LOSE A SALE BY TELLING THE TRUTH. BY BENDING THE TRUTH
 . . .
 `DON'T EDUCATE THE CUSTOMER, WAS OFTEN SPOKEN'
 . . .
 SOMEONE WHO SHOULD HAS [sic] BEEN EDUCATED BUT WAS NOT. NOT EDUCATED TO THE APPLICATION OF FOAM BEING SOLD TO A BUSINESS CALLED THE STATION.
 WHAT IS THE APPLICATION, THIS IS AN OFTEN ASKED QUESTION??? AT THE FOAM COMPANY, DID THEY ASK THE CALLER FROM THE STATION. WHAT IS THE APPLICATION? . . .
 . . .
 THEY ARE WELL AWARE IF A BUSINESS CALLS THEM UP TO PURCHASE CONVOLUTED FOAM, THAT IT IS BEING USED FOR A MATTRESS LINER, SOUND DEADENING, OR THE INSIDE OF A CASE FOR PACKAGING.
 THE FIRST TWO OF THE THREE OF THESE SHOULD BE NON FLAMMABLE FOAM." (Fax 6-7.)
Essentially, the anonymous Fax might be construed to support the Defendants' assertion that they adequately attempted to fulfill their statutory duty to comply with the Fire Code, but were actively deceived by American Foam Company or, at the minimum, indicates they might not have been informed of the foam's flammable characteristics. This information is relevant as to whether they knew or should have known of the foam's alleged danger, rendering their conduct either creating a foreseeable or unforeseeable risk of death.
On November 19, 2003, a grand juror asked the prosecution if "there are any witnesses that you would know of that would bring us exculpatory information were we to call them?" (Couto Gr. Jry. Tr. 46.) In response to the question, the prosecution did not mention the Fax, and stated in what could be considered a stilted and convoluted fashion, that they could not characterize for the jury what information was inculpatory or exculpatory, but would call any witness who the jury thought would be exculpatory. (Couto Gr. Jry. Tr. 46-51.)
No Duty To Present Exculpatory Evidence
The Supreme Court of Rhode Island has repeatedly stated that "the dismissal of an indictment on grounds of prosecutorial misconduct is an extraordinary sanction reserved for very limited and extreme circumstances.'" Bustamante v. Wall, 866 A.2d 516,525 (R.I. 2005). The Rhode Island Supreme Court addressed the issue of exculpatory evidence in State v. Acquisto.463 A.2d 122 (R.I. 1983). In Acquisto, the Supreme Court refused to dismiss counts based on the prosecutor's refusal to present certain letters to the grand jury, despite the court's assumption that the letters were exculpatory. Id. at 127. The Court declined to exercise supervisory power to scrutinize the nature and quality of evidence presented to the grand jury, as it would run contrary to the whole history of the grand jury. Id. Ten years later, the Rhode Island Supreme Court echoed this sentiment, stating "Neither we nor the Supreme Court of the United States conduct minitrials to determine the adequacy of evidence presented to the grand jury. We do not require that evidence that may later be determined by counsel for the defense to be exculpatory must be presented to the grand jury on pain of dismissal of the indictment." State v. Ellis, 619 A.2d 418, 427
(R.I. 1993).
Rhode Island Superior Court Rule 3.3(d) of Professional Conduct
Defendants argue that R.I. Sup. Ct. R. Prof. Conduct. 3.3(d) creates a duty on the prosecution greater than imposed by the Constitution, which requires the prosecutor to present exculpatory evidence to a grand jury. (See Supp. Dismiss 7, n. 2.) Rule 3.3 requires that in an ex parte proceeding, a lawyer shall inform the tribunal of all material facts, whether or not such material facts are adverse.[29] The Court first notes that violation of the Rules of Professional conduct "should not be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a legal duty." R.I. Super. Ct. R. Prof. Conduct, Art V, Preamble.
In United States v. Williams, 504 U.S. 36 (1992), the Supreme Court held that the federal district courts have no inherent power to enforce a rule requiring a federal prosecutor to present substantial exculpatory evidence to a grand jury in view of the tradition of presenting only the prosecutor's side of the evidence. As stated supra, Rhode Island courts, like federal courts, subscribe to the view that grand jury proceedings are one-sided affairs. Accordingly, this Court subscribes to the language of the United States Supreme Court, when it reasoned that:
 "Imposing upon the prosecutor a legal obligation to present exculpatory evidence in his possession would be incompatible with this system. If a balanced assessment of the entire matter is objective, surely the first thing to be done — rather than requiring the prosecutor to say what he knows in defense of the target of the investigation — is to entitle the target to tender his own defense. To require the former while denying (as we do) the latter would be quite absurd. It would also be quite pointless, since it would merely invite the target to circumnavigate the system by delivering his exculpatory evidence to the prosecutor, whereupon it would have to be passed on to the grand jury — unless the prosecutor is willing to take the chance that a court will not deem the evidence important enough to qualify for mandatory disclosure." United States v. Williams, 504 U.S. 36, 52 (1992).
The Rhode Island Supreme Court also looked to the reasoning ofWilliams when considering whether to dismiss an indictment where evidence before the grand jury was false, and prosecutors were aware of the inconsistencies when the testimony was presented. Ellis, 619 A.2d 418, 427 (1993). The Rhode Island Supreme Court quoted the Williams Court, stating that a District Court "may not dismiss an otherwise valid indictment because the government failed to disclose to the grand jury `substantial exculpatory evidence' in its possession,'" as the grand jury is an accusatory rather than adjudicative body. Id.
(citing United States v. Williams, 504 U.S. 36 (1992)). In light of case law in Rhode Island, which denies dismissal except on exceptional grounds, and the history of not requiring the prosecution to present exculpatory evidence, as well as the purpose and effect of rules of professional conduct, this Court rejects the Defendants' argument that Rule 3.3 creates a legal duty to present exculpatory evidence above that of the constitution.
Broad Question Presented No Additional Duty
Defendants' next contend that the initiative by a grand jury member to ask if any exculpatory witnesses existed invoked a duty to procure all evidence favorable to the Defendants. The grand jury certainly has the power to "compel the production of evidence or the testimony of witnesses as it considers appropriate." State v. Guido, 698 A.2d 729 (R.I. 1997). However, the question from a grand juror stated "if there are any witnesses that you would know of that would bring us exculpatory information were we to call them?" The question identified no particular witness that the prosecution could call. The Court need not decide to what extent a prosecutor must respond to a question from a grand juror. Surely the Court could not require that this one-sided affair become a full-blown presentation of all evidence based on a broad question for exculpatory evidence by any one of the grand jurors.[30] To hold otherwise would improperly put the Court in the position of grand jury micromanagement.
Answer to Grand Juror Question Does Not Rise to the Level ofMisconduct
Neither the Fax nor the subsequent interview with Warner, regarding the Fax, is exonerating. If the Fax is taken to be completely true, the State could still contend that the Defendants failed to make a diligent effort to inquire as to the foam's characteristics in violation of a statutory mandate. Neither the Fax nor the subsequent interview with Warner revealed information regarding concealment; no specific company policy requiring or encouraging affirmative misrepresentation or deceit has been identified. (Warner Int. Tr. 9.) Moreover, the supposed encouragement to refrain from informing the customer of product qualities was not specifically linked to flammability qualities. (Warner Int. Tr. 10-11.) Finally, the credibility of both the Fax and the interview are both questionable, as Warner appears to be a former disgruntled employee who had admitted disagreements with the owner (Warner Int. Tr. 4) ("The owner is greedy . . . he needs to be taught a good lesson, not just his insurance company paying off for him.") Also, the testimony given by Warner in front of the grand jury was not substantially impeached by the Fax. As such, although the Fax may still be somewhat favorable to the Defendants, it is not substantially exculpatory.
When answering the grand juror question regarding exculpatory evidence, the prosecutors apparently viewed the word "exculpatory" narrowly, as to include evidence that would directly contradict evidence that they were presenting or evidence which would exonerate the Defendants. Although the prosecutor defined "exculpatory evidence" to include evidence that would tend to mitigate the wrongfulness of the act or exonerate or bear upon the innocence of the individual, it is clear from later qualification that prosecutors viewed exculpatory evidence as evidence that would directly contradict evidence the prosecutors were presenting. The prosecutors qualified the definition of exculpatory evidence, stating
 "[FERLAND] I'm unaware of anyone that's going to run in — and I'm not undermining your question at all, please don't take this the wrong way — I'm not aware of anyone who's going to run in and say, I actually operated The Station Nightclub, you know the Derderians had nothing to do with it . . . [WHITE] [T]o characterize something as exculpatory is something that's fairly debatable. Does this telephone make me more likely to be guilty or less likely to be guilty? Different people may argue the — the merits of the particular position." (Couto Gr. Jr. Tr. 44-45.)
The prosecution did not state that no evidence or testimony from any source they had thus far received would be favorable to the Defendants. Rather, the State characterized the anonymous Fax, which contained evidence mildly favorable to the Defendants, as not clearly within the scope of exculpatory evidence as to warrant disclosure to the jury; this interpretation does not rise to the level of flagrant and overbearing misconduct by the prosecutor to warrant dismissal. DiPrete, 682 A.2d 1373, 1375. Thus, even if the Court was to hold that a jury question for exculpatory evidence required presentation of all substantial exculpatory evidence, which it does not, this evidence would not rise to a level of clearly exculpatory evidence. Nor does the prosecutors' conduct rise to the level of purposeful deceit.
Polyurethane Foam Newscast
Defendants state "additional conduct by the prosecutors supports the Defendants' position that they acted in a coercive and misleading manner with regard to the evidence presented to — and withheld from — the Grand Jury that indicted the Defendants." (Supp. Dismiss 7.) The only "additional evidence" the Defendants identify is the polyurethane foam newscast ("Newscast"). The Defendants contend that the State's presentation of evidence that Jeffrey Derderian "did a news show" regarding polyurethane foam was misconduct because Jeffrey Derderian allegedly had limited knowledge of the story and because the story featured the foam used in mattresses, as opposed to foam used for acoustical purposes. (Supp. Dismiss 9.) Defendants further argue that the phrases "did a news show" communicates more extensive involvement than Jeffrey Derderian had with the newscast.
The Defendants' contention is without merit. The "[G]rand jury may decide whether the quality of evidence presented to it is sufficient to warrant return of indictment. In Rhode Island the rules of evidence that might apply to trial do not apply to a grand jury." State v. Miller, 679 A.2d 867, 870 (R.I. 1996) (citing Acquisto, 463 A.2d 122, 127). Presentation of the newscast was not so irrelevant as to constitute prosecutorial misconduct. The relevance of the newscast is the State's allegation that Jeffrey Derderian knew or should have known the foam on The Station walls was dangerously flammable. The newscast which featured Jeffrey Derderian concerned the flammability of bed foam. This could lead the grand jury to believe that Jeffrey had some knowledge regarding the danger of some foam. The Defendant's actual role in the production of the news segment is irrelevant as the Court cannot consider the quality of the evidence. Rhode Island has declined to establish "a rule permitting defendants to challenge indictments on the ground that they are not supported by adequate or competent evidence." See
Acquisto, 463 A.2d 127. It was the grand jury's responsibility to consider the quality of the evidence. "The court does not review the grand jury's determination in deciding to return an indictment on the grounds of adequacy of evidentiary support."State v. Ellis, 619 A.2d 418, 427. Thus, the Defendants' arguments relating to the newscast add nothing to their argument for prosecutorial misconduct. As such, the Court does not believe the failure to present the Fax, coupled with the nature of the presentation of the tape, constituted prosecutorial conduct as to invoke constitutional considerations.
No Prejudice to the Defendants
Finally, the Court notes that the Defendants have not been prejudiced by any of the alleged prosecutorial misconduct. "[D]ismissal of an indictment grounded on an alleged nonconstitutional error is proper only `if it is established that the violation substantially influenced the grand jury's decision to indict' or `if there is grave doubt that the decision to indict was free from substantial influence of such violations.'"State v. Franco, 750 A.2d 415, 418 (R.I. 2000) (quotingState v. Chiellini, 557 A.2d 1195, 1199 (R.I. 1999)). "Such a dismissal should be limited `to situations in which there has been flagrant prosecutorial misconduct accompanied by severe incurable prejudice.'" Bustamante v. Wall, 866 A.2d at 525
(citations omitted).
The Court notes that the nature of the Fax and subsequent testimony from Warner regarding the Fax does not present facts dramatically different than those presented to the grand jury trial. Neither Warner nor the president ever insinuated that the Company must have given the Defendants information regarding the flammability of the foam. Aram DeMonoeulian ("DeMoneulian"), the owner of American Foam Company, admitted the foam was probably not shipped with an information sheet (MSDS sheet), which would have indicated the flammable qualities, as such information sheets usually shipped only upon customer request. (Gr. Jr. Tr. 29, 37). DeMonoeulian further stated:
 "When a customer calls . . . and says do you have this type of foam, I want it for this purpose and then we go from there. . . . we have to get the info from the customer, you know. They have to tell us. We can't kinda know everything they're doing. When people buy, they come in and buy pieces of foam, they take it home. We don't quiz them. Is it for your dog or is it for yourself or is it for outside?" (DeMonoeulian Gr. J. Tr. 34.)
The Fax's allegation that the company had a policy of not informing the customer of the characteristics of their products is very similar to the owner's admission regarding the company's customs of providing limited information to the customer, unless the customer requested otherwise. The Court could not find the exclusion of the anonymous Fax and potential questions regarding it to be gravely influential to the grand jury's decision because the relevant information in the Fax was already substantially presented to the grand jury.
Moreover, the State elicited testimony in front of the Grand Jury that raised the issue of the Defendant's limited involvement with the newscast. (Gr. Jr. Tr. Beese 151-152) ("[W]hat [Jeffrey Derderian] told me was that the story was pretty much given to him. . . . [H]e didn't do the research on it. That somebody else had done the research and they were supposed to do the report but for some reason, they couldn't do the report, and they dropped it on him and he had to do the report."). Further, the actual videotape was shown to the Grand Jury. Clearly the grand jury would notice that the report focused on mattress foam as opposed to acoustical foam. Any prosecutorial misconduct, although the Court perceives none, will be cured by a subsequent trial on the merits. Bustamante v. Wall, 866 A.2d at 525.
 CONCLUSION
For the foregoing reasons, the Court denies the Defendants' motion to dismiss any of the counts contained in the indictment.
[1] For purposes of the Grand Juror absence argument, the Defendants' appear to contend in their supporting memoranda that the entire two hundred count indictment should be dismissed, although the motion itself only requests dismissal of one hundred counts.
[2] The motion to dismiss actually states the basis as U.S. Const. amend. XV, instead of amend. XIV. As U.S. Const. XV amend. relates to the right to vote and the Defendants' argument relates to due process, the Court will take this to be a typographical error.
[3] Defendants were indicted with their Co-defendant, Daniel Biechele. See State v. Biechele, No. K1-03-53A (R.I.Super.Ct. December 5, 2005).
[4] For purposes of this decision, the Fire Code statutes that the Court refers to are as they appeared on February 20, 2003. Since the Station Fire, the Legislature has revised the Fire Safety Code to increase fire safety in response to this horrible tragedy. See § 23-28.01-1 (amended 2003) (Compiler's Notes).
[5] Later chapters in the fire safety code relate to specific fire concerns that are not attached to a certain building usage, such as exit signs, explosives, and storage and handling of liquefied natural gas. See §§ 28.23, 28.28, 28.33.
[6] G.L. § 31-27-2 (amended 2000) allowed for conviction of a person operating under the influence of alcohol to be convicted in accordance to subsection (b) and (d) of the statute. Both subsection (b) and (d) required the blood alcohol level to be assessed before a penalty could be established.
[7] Defendants also state that this "error" was corrected in the new version of the statute, which has added a penalty within the statute itself and uses an active verb tense. See §23-28.6-23 (Supp. 2005). Even if the new statute does use improved verbiage and penalty placement, it does not mean the original statute was unconstitutionally vague or ambiguous.
[8] The Defendants also posit § 23-28.1-7 — "Conformity Required" — implies notice into the foam statute. This section would simply apply to the initial process of ensuring buildings are in compliance with the Fire Code; it allows whomever the authority having jurisdiction under the sections of the Fire Code to give notice and create a timetable for compliance once a fire code statute takes affect. As the foam statute had been in effect for some time when the fire occurred, this section is also irrelevant.
[9] The Defendant's citation to Commonwealth v. Porrazzo to support their argument is misplaced. 516 N.E. 2d 1182 (Mass.App. 1987). This case was decided on the fact that the Massachusetts fire code statute had a clear notice requirement; it was not a case that a court implied notice into a statute which did not contain language regarding notice.
[10] The stated purpose of the Fire Safety Code was "[t]o specify reasonable minimum requirements for fire safety in new and existing buildings facilities . . . in the various cities and towns in this state[.]" Section 23-28.1-2(2)(1997). The purpose of the Fire Safety Code Board is to "promulgate, amend, and repeal rules and regulations to safeguard life and property from the hazards of fire and explosives consistent with the provisions of the Fire Safety Code . . . in accordance with standard safe practice as embodied in widely recognized standards of good practice for fire prevention and fire protection." Section23-28.3-3.
[11] "23-28.5-1. Inspection of places where combustiblematerials accumulate. — The authority having jurisdiction is hereby authorized and empowered to inspect at any reasonable hour all buildings, structures, or other places, except buildings used wholly as dwelling houses, where any combustible material, that is or may become dangerous as a fire menace to the buildings structures, or other places, has been allowed to accumulate, or where the authority having jurisdiction has reason to believe that the material of a combustible nature has accumulated, or liable to accumulate. . . . The occupant or occupants thereof shall be subject to the same duties and liabilities as are provided in the Fire Safety Code, and shall likewise be subject to the provisions of § 23-28.5-3."
[12] Defendants also specifically allege that a penalty for "violation" of a statute is vague, but fail to elaborate on this concept. (Reply 9.) Statutory provisions that allow punishments for violations of a statute are not vague. The Defendants have not called to the Court's attention any contrary definition or interpretation that would require notice before prosecution is imbedded in the word "violation." If violation itself is a vague term, there are many other Rhode Island statutes which would be constitutionally infirm. See, e.g., § 11-9-1.3 — Child pornography prohibited — (a) Violations. It is a violation of this section for any person to: (1) Knowingly produce any child pornography . . . (emphasis added).
[13] When deciding the criminal negligence manslaughter question, the McLaughlin Court also consulted a LaFave treatise which provides the same analysis of misdemeanor manslaughter.See LaFave and Scott, Criminal Law (2d. 1986).
[14] Section 31-27-2.2(a) provided in relevant part:
 "When the death of any person other than the operator ensues as a proximate result of an injury received by the operation of any vehicle, the operator of which is under the influence of, any intoxicating liquor . . . the person so operating such vehicle shall be guilty of `driving under the influence of liquor or drugs, resulting in death.'"
Section 31-27-2.6(a) provided in relevant part:
 "When serious bodily injury of any person other than the operator is caused by the operation of any motor vehicle, the operator of which is under the influence of any intoxicating liquor . . . the person so operating such vehicle shall be guilty of driving under the influence of liquor or drugs, resulting in serious bodily injury."
[15] It should be further noted that the Supreme Court did not require the State must prove the intoxication caused the accident; rather the State had to prove that the defendant's manner of operation proximately caused the death. If the Court had held that the intoxication itself must be the proximate cause of the death, Rhode Island would be employing view two of LaFave's limitations on misdemeanor manslaughter, which requires the illegal excess to cause the death. See LaFave, SubstantiveCriminal Law, § 15.5(c).
[16] Another indication that the Defendants' argument is unavailing is that felony-murder actively exists in Rhode Island.See State v. Stewart, 663 A.2d 912 (R.I. 1995) (Defendant's conduct permitting her infant child to be a habitual sufferer for want of food or proper care was sufficient felonious conduct to support felony-murder conviction).
[17] The Court also rejects the argument that one set of counts should be dismissed to prevent jury confusion, as the theories of manslaughter are similar (argument adopted from Co-defendant Biechele). As the Rhode Island Supreme Court indicated presentment of both theories of involuntary manslaughter was proper in McLaughlin, this Court declines to make such presentation unavailable to the State. The Court further notes that the State's two theories of involuntary manslaughter are based on different facts. The misdemeanor manslaughter counts are based solely on the Defendants' failure to render the foam fire safe according to the statutory mandate. The criminal negligence involuntary manslaughter counts are based on the allegation that while performing the lawful act of owning and operating a nightclub, Defendants were criminally negligent in preventing members of the public from using a certain door on the west wall of the nightclub, permitted pyrotechnics to be used within the establishment, disregard of maximum safety requirements, used of a door that swung inwards, and other actions or inactions relating to the Defendants' ownership of the nightclub. (State Bill of Particulars 2-5.)
[18] "Wood alcohol," also referred to as "methanol," "methyl alcohol," and "carbinol," can be deadly when ingesting as little as 30 ml. In the present day, it is used as an industrial solvent which may be found in antifreezes, gasoline, diesel oil, picnic stoves, torches, and is used as a solvent in the manufacture of vitamins, hormones, and other pharmaceuticals. The Merck Index:An Encyclopedia of Chemicals, Drugs, and Biologicals (12th
ed.).
[19] The higher standard of criminal negligence had not yet developed. It is unclear exactly why the sale of the whiskey was illegal, as the opinion fails to cite the statutory violation.
[20] See G.L. 1956 § 11-16-4 "Furnishing wood alcohol for beverage purposes"; § 21-30-4 "Sale or possession of wood alcohol with unlawful intent."
[21] In the present time, a non-physician who administered a controlled substance to an individual which resulted in death could be convicted of first degree murder under 1956 § 11-23-1, as delivery of a controlled substance is a specifically enumerated felony within the statute.
[22] See e.g., State v. Puryear, 590 P.2d 475, 479
(Ariz.Ct.App. 1979) ("While many early American decisions make the distinction in involuntary manslaughter cases between unlawful acts mala in se and those mala prohibita, the common law origins of this practice are dubious at best."); Commonwealth v.Samson, 196 A. 564, 567 (Pa.Super.Ct. 1938) ("There is a historical basis for the distinction between [malum in se and malum prohibitum] offenses, but modern decisions recognize little, if any, difference. . . . Their origin, as suggested by some writers, is probably ecclesiastical. . . . There was a sound basis for common law discrimination between acts malum in se and malum prohibitum, which does not prevail now. . . .")
[23] The Court rejects the Defendants' suggestion that Rhode Island should adopt Massachusetts' limitation of misdemeanor manslaughter to assault and battery misdemeanors. There is no support for this adoption in Rhode Island law.
[24] Rhode Island joins a minority of states and the federal courts in adhering to the traditional view of grand juries, which does not require the prosecutor to present exculpatory evidence to the grand jury. Sara Sun Beale, et al., Grand Jury Law andPractice § 4:17, at 4-84 (2d ed. 2002).
[25] "In its indicting capacity, the grand jury is said to act as a shield, examining evidence to see whether there is `sufficient evidentiary support to justify holding the accused for trial on each charge' and thereby protecting the public from baseless prosecutorial accusations. In its investigating capacity the grand jury is said to act as a sword, ferreting out criminal conduct." Guido, 698 A.2d at 735. (citing 1 Sara Beale and William Bryson, Grand Jury Law and Practice § 1:07 at 35(1986)). "Because [the grand jury's] task is to inquire into the existence of possible criminal conduct and to return only well-founded indictments, its investigative powers are necessarily broad. `It is a grand inquest, a body with power of investigation and inquisition, the scope of whose inquires is not to be limited by questions of propriety or forecasts of the probable result of investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime." Guido, 698 A.2d at 735 (quotingBranzburg v. Hayes, 408 U.S. 665, 668 (1972)).
[26] Of the remaining jurors, one was absent three days, three jurors were absent four days, one juror was absent five days, and one juror was absent seven days. The one juror that voted not to concur in indictment of the Derderians was absent one day.
[27] The Rhode Island District Court has also observed the common occurrence of juror absence and held a Defendant's contention that the absence policy warranted dismissal to be without merit. The court stated "[t]he evidence [did] not reflect that the United States Attorney absolved any grand jurors from attending, or evaluated the reasons for nonattendance, or that he attempted to pre-select the actual composition of the panel on any occasion . . . [t]here is no hint that these reasons [for absence] were devised by the prosecution or known by it sufficiently in advance of the fact to permit the Machiavellian type of planning which the defense ascribes to the government."United States v. Marrapese, 610 F.Supp. 991, 1006 (1st Cir. 1985).
[28] The Defendants also speculate that jurors might have left early some days, although no evidence exists of this. Even if this was the case, the Court's holding would be the same based on the traditional view of the grand jury and lack of evidence of prosecutor's wrongful purpose. The Court further notes that Rhode Island does not have a law, rule, or policy of requiring an absent juror to review transcripts or refrain from discussing what they missed with other jurors. The speculation that the jury was misinformed by other juror's of what they missed while absent also does not disqualify such jurors as they were properly instructed to make an independent judgment on the merits. "[A]bsent evidence that the grand jury did not review the indictment and adopt it as its own, there really would be no reason to dismiss the indictment." Mainelli, 542 A.2d 1311, 1313 (citations omitted). See U.S. v. Williams, 504 U.S. 36,53 ("[T]he `common law' of the grand jury is not violated if thegrand jury itself chooses to hear no more evidence than that which suffices to convince it an indictment is proper."(citations omitted)).
[29] "(d) In the ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer which will enable the tribunal to make an informed decision, whether or not the facts are adverse."
[30] See State v. Delvalle, No. P1-02-0211C, available at
2003 R.I. Super LEXIS 212 (R.I.Super. 2003) (Rhode Island Superior Court reaching the same conclusion when considering the impact of a grand juror request for exculpatory evidence.)